447 F.2d 245
 David B. CORTRIGHT, on behalf of himself and others similarly situated, Appellees,
v.
Stanley R. RESOR, Secretary of the Army, Major General Walter M. Higgins, Commanding General of Fort Hamilton Complex, New York, Respondents-Appellants,
 No. 1051.
 Docket 71-1365.
 United States Court of Appeals, Second Circuit.
 Argued June 10, 1971.
 Decided August 20, 1971.
 
 Frederick H. Cohn, New York City (Martin R. Stolar, New York City, of counsel), for appellees.
 Anthony J. Steinmeyer, Atty., Department of Justice, Washington, D. C. (L. Patrick Gray, III, Asst. Atty. Gen., Edward R. Neaher, U. S. Atty., Alan S. Rosenthal, Atty., Department of Justice, of counsel), for appellants.
 Before FRIENDLY, Chief Judge, and HAYS and OAKES, Circuit Judges.
 FRIENDLY, Chief Judge:
 
 
 1
 In Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953), clearly the Supreme Court decision most closely in point, the Court stated it had "found no case where this Court has assumed to revise duty orders as to one lawfully in the [armed] service." So far as has been shown by the research of counsel, that statement remained true, not only for the Supreme Court but for any other civilian court, with respect to duty orders not transgressing statute or regulations, until the order here under review. The limitations on the civilian courts in this respect were recently recognized by Judge Gesell in Sanders v. Westmoreland, 2 SSLR 3157 (D.D.C.1969). The order here is sought to be justified on the ground that the Army's transfer of Specialist Cortright from the 26th Army Band at Fort Wadsworth, New York, to the 62nd Army Band at Fort Bliss, Texas, violated the First Amendment. We do not say that a case could never arise where a transfer order could be invalidated by a civilian court on such a basis. But any such judicial intrusion into the area broadly confided by the Constitution to the President as commander-in-chief and his authorized subordinates must await a stronger case than this one.
 
 I.
 
 2
 There is little dispute concerning the basic facts. After receiving an induction notice, David B. Cortright, recently graduated from college, enlisted in the Army in August 1968 for three years under an agreement that he be assigned to the 26th Army Band, Fort Wadsworth, N. Y., which was part of the First Army, for a minimum of one year. About half of the Band was composed of college graduates similarly recruited. After receiving basic training, Cortright joined the Band in November 1968, serving as a drum major and baritone player. The authorized complement of the Band was 64 until August 1969 when the Continental Army Command reduced it to 42, effective May 1970. The special missions of the Band, as set forth in Fort Hamilton Pamphlet No. 220-90, were:
 
 
 3
 a. To promote and maintain the morale and esprit-de-corps of the troops by providing appropriate music for military ceremonies, concerts, entertainment and recreational activities.
 
 
 4
 b. To assist in maintaining an effective community relations program through participation in suitable local events.
 
 
 5
 c. To support the Army Recruiting Program by performing at senior high schools and colleges.
 
 
 6
 In addition, as stated by Major General Ciccolella, the Chief of Staff of the First Army, members of the Band shared the Army's general mission of being "able to fight and be[ing] able to defend vital installations and be[ing] responsive immediately to orders without any question."
 
 
 7
 On November 9, 1969, there appeared in the New York Times an advertisement signed by 1,366 active duty servicemen, including 39 from Fort Wadsworth, all but one of whom were members of the Band. The petition called for the immediate withdrawal of United States forces from Vietnam and urged members of the armed forces to participate in protest marches in Washington, D. C. and San Francisco. Cortright's name appeared on the petition and he had initiated its circulation among the bandsmen. The Government does not dispute that this was an entirely proper exercise of the signers' First Amendment rights "to petition the Government for a redress of grievances." However, the Band's leader, CW4 Shettle, a noncommissioned officer, took it upon himself to call a special formation of the Band, where he discussed the advertisement, warned that General Higgins, Commanding General of the Fort Hamilton Complex (which includes Fort Wadsworth) was aware of the signers' activities, and advised them that under similar circumstances the 7th Army Symphony had been disbanded.[1] There is no proof that Shettle's self-styled "word to the wise" was directed or even authorized by General Higgins or any other high officer, although there is evidence that the General knew of Cortright's role.
 
 
 8
 In the spring of 1970 Cortright and others distributed a new protest petition among the members of the Band. This petition engendered a good deal of discussion. A meeting was called at the urging of those opposed to signing the petition; it was agreed that the petition would be published only if a majority approved. There is no suggestion that this action was stimulated by any responsible officer of the command. By mid-June 1970, 35 members had signed the new petition. At this point the new head of the Band, a non-commissioned officer, CW3 Patrick Flores, called into his office one Sicola, a Band member who had reservations about the petition, and advised against its publication. Flores also addressed the Band. While stating his belief that the petition was legal, he warned of possible repercussions if it were published. Again there is no evidence that this was anything more than Flores' personal decision. After discussing the matter with other members and taking a poll, Cortright, who had assumed a position of leadership, told the civilian group sponsoring the petition not to publish the names of any Band members.
 
 
 9
 In all likelihood this would have been the end of the matter but for an incident on July 4, 1970. As the Band was about to head a parade on Staten Island, five women — Cortright's fiancée and the wives of four other Band members — sought to march along with the Band, making it known that they were related to members. They were carrying signs, such as "Military Wives for Peace," "Nix-On War," and "Kill Poverty Not People."[2] The marshals refused to allow the women to march with the Band but did allow them to march behind the parade. The spectators and one parade participant reacted with hostility. Cortright's fiancée was struck by a thrown object, a veteran hit another woman, and the crowd tore up the signs. Toward the end of the parade the women again walked beside the Band until Flores ordered them away. The incident was reported in the local press.
 
 
 10
 This was too much for Flores. On July 8, after conferences with General Higgins, he announced ten changes in the Band's duties, including extension to an eight-hour day, mandatory attendance at reveille, withdrawal of exemption from full police detail, and the termination of private music lessons during duty hours. It is not contended that any of these changes transgressed Army regulations; the Band apparently had been enjoying a favored position. However, as the district judge permissibly found, "Flores explained [to the Band] that the changes were instituted because of the men's anti-war activities" and advised that if they did not end such action and accept the duty changes, others might follow.
 
 
 11
 Cortright and 35 other members of the Band thereupon dispatched a letter to General Higgins, informing him of this and asking for rescission of the duty changes. The General took the matter with appropriate seriousness, and immediately instructed his Deputy, Colonel Merrick, other officers and Flores to conduct "an open door policy meeting" with the Band.
 
 
 12
 Colonel Merrick told the Band that their anti-war activities were protected, that the new duty orders were not intended to be punitive, and that Flores should be reprimanded for characterizing the changes as punishment for the expression of dissent.[3] He justified the changes, except a few which he apparently modified in a slight degree, on sound military grounds. At the conclusion of his talk, he invited questions. The only one was from Cortright, who asked if this constituted General Higgins' official reply to his letter. Colonel Merrick said that it did unless the Band members were dissatisfied. There is nothing to indicate that any further representations were made to Colonel Merrick or General Higgins.
 
 
 13
 On the other hand, the incident had its expectable repercussions with the Band. Although the new duties were ones which the Army could have ordered to be performed all along, many of the bandsmen resented the sudden changes. Morale declined and tension built up within the unit. One member of the Band swung at another. Another applied for a transfer because he "did not approve of what was going on in the band from both sides." While the country could doubtless have survived continued dissension within the 26th Army Band, the fact remains that the unit was no longer geared to render optimum performance of its peacetime and potential wartime missions. Furthermore, there was no assurance that Cortright, Lovallo and others might not cause a repetition of something like the July 4 incident.
 
 
 14
 Accordingly the matter was brought to the attention of Major General Ciccolella, Chief of Staff of the First Army at Fort Meade, Maryland, with the recommendation of Cortright's immediate command that he be transferred. As earlier indicated, prior to any of the incidents here recited, General Higgins had been under orders to reduce the strength of the Band to 42 by May 1970, but, as General Ciccolella was informed by his staff, the Band was still 10 to 12 over its authorized strength. Believing that what Cortright "was doing in the band was weakening its general morale, its discipline and effectiveness" and knowing that he was eligible for transfer,[4] the General, on July 17, 1970, directed his transfer to the Fourth Army at Fort Bliss, Texas, which had requested additional bandsmen. He testified he "intended to accomplish the strengthening of the [26th Army] band and making it a better military unit, a unit that would accomplish its mission" — not to "punish" Cortright. Other transfers were made to bring the 26th Army Band down to its authorized strength. There is no evidence of discrimination against Cortright's followers either as to the fact or the place of transfer. Cortright has continued to be active in the peace movement since his arrival at Fort Bliss; there is no suggestion that he has been placed under the slightest restraint in this respect.
 
 II.
 
 15
 On July 22, 1970, even before reporting to Fort Bliss, Cortright, pursuant to Art. 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938,[5] brought a complaint against the commanding officers who he believed had wronged him. The following day, he instituted this action in the District Court for the Eastern District of New York. The proceedings were temporarily held in abeyance pending completion of the military inquiry. Colonel Russell Bieber, a non-lawyer officer at Fort Meade, was assigned to investigate the Article 138 complaint. He obtained sworn statements from many of the persons already named and the opinion of the First Army information officer at Fort Meade that "if publicity of dissident trends in the 26th Army Band continues, its effectiveness as a First Army Community Relations element" would be generally decreased. Cortright was invited to supply additional information from his post in Texas; he added only that a sergeant from Fort Wadsworth had been sent to the airport to insure that he departed for Fort Bliss as scheduled, that he had been unaccountably prevented for a few days from signing in with the band unit at Fort Bliss upon his arrival, and that the Fort Bliss band unit was overstaffed in his specialty. Colonel Bieber reported that the July 8 changes in the Band's duties "were made for the purpose of improving the military efficiency of that unit, and that such changes were in the best interest of the unit and the United States Army." He also found that Cortright's transfer "was essential to the continued effective performance of the community relations mission of the 26th Army Band, and that such transfer was not punitive in nature."
 
 
 16
 Upon receiving Colonel Bieber's report, the Judge Advocate General returned it for further investigation. Additional statements were obtained from 41 current and former members of the Band. Many refused to answer some questions on Fifth Amendment grounds. One told Colonel Bieber that he did not want to give any information because this litigation was pending. The colonel told him that he had to answer and, allegedly, that he should not discuss his statements with anyone including his own lawyer. Colonel Bieber adhered to his recommendation that Cortright be informed that his Article 138 complaint was without merit. This time the Judge Advocate General, acting for the Secretary of the Army, approved, on November 26, 1970.
 
 
 17
 Meanwhile five other Band members who had received transfer orders to Vietnam and Korea intervened in this action and secured stays of their transfers from October 17 to December 27, 1970.[6] A considerable amount of discovery was had, the Army being directed to produce, among other items, all correspondence between Fort Hamilton and Fort Meade relating to the Band or its members, and the authorized and actual strengths of all units, including those in Vietnam and Korea, to which members of the 26th Army Band had been transferred. Extensive depositions from the Article 138 investigation were taken as exhibits. After a two-day trial, the court ordered Cortright's transfer rescinded. It sustained the five other transfers, holding that they "were apparently attributable solely to a proper desire to reduce the 26th Army Band to its authorized strength," that the intervenors were among the most eligible candidates for transfer overseas, and that those ordering the transfers "had not received any extraordinary communications regarding them." Cortright and the intervenors were allowed to represent the 26th Army Band as a class with respect to threats against the Band, but not with respect to individual transfers. Finally the defendants were ordered to post on bulletin boards utilized by the Band copies of the Army's current official guidelines regarding dissent, DOD Directive 1325.6, and a "one page statement of the facts and conclusions in this litigation" — a feat which, as the foregoing summary indicates, would not be easy of accomplishment if the conflicting considerations were to be fairly presented. The district court stayed its judgment pending an opportunity for the Government to appeal, and this court granted a further stay pending an expedited appeal.
 
 III.
 
 18
 A considerable portion of the opinion of the district court, 325 F.Supp. 797 (E.D.N.Y.1971), was devoted to a discussion of its jurisdiction. The difficulties stemmed from the requirement of a $10,000 jurisdictional amount in "general" federal question actions under 28 U.S.C. § 1331, as distinguished from other sections that do not require a minimum monetary amount. The complaint contained a conclusory statement that "the amount in controversy exceeds the sum of $10,000 exclusive of costs and interests," but made no specific allegations to support this.
 
 
 19
 The judge discussed at some length whether the requirement of jurisdictional amount had fallen into desuetude in cases involving alleged deprivation of constitutional rights by federal officers, whether an allegation of interference with the exercise of free speech "almost, by definition" brings $10,000 into play, and whether, if not, the requirement was itself unconstitutional. We need not pass on any of this since in its brief here the Government does not challenge the judge's alternative holding that jurisdiction was conferred by 28 U.S.C. § 1361, giving the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," irrespective of the amount in controversy. It is true that the scope of review of official action under § 1361 may be more limited than when general federal question jurisdiction exists. See United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371, 374-375 (2 Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969). However, our decision in this case would not be different if jurisdiction also lay under 28 U. S.C. § 1331.
 
 IV.
 
 20
 We put aside at the outset one ground relied on to some extent by the district court but not strongly urged by appellees in this court. This is that Cortright's transfer "violated the Army's own regulations," to wit, A.R. 614-6 para. 4(a). This provides:
 
 
 21
 4. General policies, PCS of all personnel.
 
 
 22
 a. Department of the Army policy is that permanent change of station travel for all military personnel be authorized only on a military necessity basis and that all nonessential movements be eliminated. Of continuing importance to the Department of the Army is the need to reduce both the numbers and frequency of movements of military personnel thereby achieving greater continuity and stabilization with a resultant savings of travel funds.
 
 
 23
 Apart from the point, apparently not considered by the district court, that, under A.R. 614-6, para. 2(a), the regulation does not "apply in times of war or national emergency," the latter of which has existed since President Truman's Proclamation No. 2914, issued December 16, 1950, 64 Stat. A454, not every violation of a military regulation gives a serviceman a justiciable claim. The basis for and the limits of the principle whereby civilian courts will require the military to follow procedures, which the latter has itself adopted, are exemplified in such decisions of this court as Smith v. Resor, 406 F.2d 141, 145-147 (2 Cir. 1969); Nixon v. Secretary of the Navy, 422 F.2d 934 (2 Cir. 1970); Feliciano v. Laird, 426 F.2d 424, 429 (2 Cir. 1970); and United States ex rel. Donham v. Resor, 436 F.2d 751 (2 Cir. 1971). The regulations, the breach of which led to our asserting the right to intervene in those cases, were regulations developed for the protection of servicemen, not regulations designed simply to promote the efficient functioning of the military establishment. The second sentence of the regulation here in question, not quoted by the district judge, makes it clear that the purpose of the regulation was to secure economy — not to provide a serviceman eligible for transfer under his contract of enlistment and the applicable regulations with a ticket to the courthouse to challenge any transfer that was distasteful to him.
 
 
 24
 The First Amendment elements of the case seem considerably less portentous to us than they did to the district judge. Appropriate concessions by both sides have narrowed the issue to one of relatively small scope.
 
 
 25
 The Government does not contend that, by joining the armed forces, a citizen surrenders his First Amendment rights. To the contrary, DOD Directive 1325.6, entitled "Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces," which was issued prior to any of the incidents here in question and which the judge approved to the extent of directing its public display at Fort Wadsworth, expressly recognizes that "the service member's right of expression should be preserved to the maximum extent possible, consistent with good order and discipline and the national security." Appellees can scarcely dispute the reasonableness of the final clause of the sentence just quoted, or of the next two reading: "On the other hand, no Commander should be indifferent to conduct which, if allowed to proceed unchecked, would destroy the effectiveness of his unit. The proper balancing of these interests will depend largely upon the calm and prudent judgment of the responsible Commander." In addition, DOD Directive 1344.10, entitled "Political Activities by Members of the Armed Forces," expressly sanctions such activities as signing a petition for specific legislative action or writing a letter to the editor of a newspaper expressing the member's personal views concerning public issues.
 
 
 26
 The appellees, for their part, do not assert that a soldier's rights of free expression are precisely the same as a civilian's. It could not be seriously contended, for example, that the First Amendment entitled Cortright, while blowing his baritone in the Fourth of July parade, to carry a sign applying the currently popular four letter word to the Declaration of Independence. Neither did it entitle him to arrange to have his fiancée march by his side and carry such a sign. So ardent an advocate of a broad reading of the First Amendment as Professor Thomas Emerson has written, "To a certain extent, at least, the military sector of a society must function outside the realm of democratic principles, including the principle of freedom of expression" and "members of the armed forces, at least when operating in that capacity, can be restricted in their right to open discussion." Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 935-36 (1963). See also Kester, Soldiers Who Insult the President; An Uneasy Look at Article 88 of the Uniform Code of Military Justice, 81 Harv.L.Rev. 1697, 1740-56 (1968); Dash v. Commanding General, 307 F.Supp. 849, 852 (D.S.C. 1969) (Russell, J.), aff'd 429 F.2d 427 (4 Cir. 1970), cert. denied 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1971).
 
 
 27
 We see no basis for concluding that if Cortright and his like-minded friends had limited themselves to signing peace petitions or engaging in protest marches while on leave, the Army command would have interfered in any way. The Secretary of the Army and General Higgins cannot be held responsible for the remarks of CW4 Shettle after the November 1969 petition and their effect on the attempt to secure signatures for a second petition in the spring of 1970 in the absence of evidence that someone in a command position had stimulated them. What triggered the difficulties here was the prearranged participation of Cortright's fiancée and the four wives in the July 4 parade.[7] While these ladies had every right to engage in a protest march of their own and carry such signs as they wished, it does not follow that Band members were entitled to arrange for or to sanction their accompanying the Band when it was performing its mission of leading a Fourth of July parade. Cortright must have known that such conduct would be offensive to many participants in the parade, and to at least some spectators and fellow members of the Band and would thus be likely to provoke the disruptions that it did. It is true enough that a private citizen may not constitutionally be convicted under a general breach of the peace statute for making a speech simply because this has "stirred people to anger, invited public dispute, or brought about a condition of unrest." Terminiello v. Chicago, 337 U.S. 1, 5, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949).[8] But this is precisely the area where a soldier, when wearing his uniform and performing a military assignment with his unit, may be subjected to discipline for contributing to disorder, to which a civilian could not. Surely, when CW3 Flores brought the matter of the 4th of July parade to General Higgins' attention, the General was not required to shrug it off and do nothing to prevent its repetition. If after properly investigating the facts and finding that the five Band members had arranged for or sanctioned what their ladies had done, he had then and there transferred Cortright and the four husbands to different stations as an appropriate method for preventing similar incidents in the future, we would perceive no unconstitutional impairment of their rights.[9] One of the missions of the Band, into which Cortright had voluntarily enlisted, was "to assist in maintaining an effective community relations program through participation in suitable local events." This had been thwarted by the women's endeavor to march with the Band on July 4, and General Higgins was entitled to take suitable measures to avoid a similar performance in the future.
 
 
 28
 Instead of taking action directed specifically at the five men, the General, endeavoring to exercise the "calm and prudent judgment" adjured by the Defense Department's directive, took the course of requiring all members of the Band to observe duty regulations from which previously they had been informally exempted. While it would be naive to suppose he did not realize that the Band members would regard this as causally related to the July 4 incident, doubtless his hope was that this measure would restore order and prevent a repetition of unseemly conduct, which he might have regarded as less provocative action than disciplining the five men as such. That, in substance, was what Colonel Merrick endeavored to explain. Although the order seems actually to have accentuated dissension rather than diminished it, this was at most a fault in judgment in an effort to avoid what the General might have thought would be regarded as more drastic measures. When its failure became apparent, the General recommended that, in order to restore the effectiveness of the unit, Cortright should be transferred to another band in line with the program of personnel reduction in the unit that had been ordered long before any incidents occurred. When General Ciccolella accepted that recommendation, concededly in a good faith belief that he was acting for the good of the Army, the matter should have been ended so far as the civilian courts are concerned.[10]
 
 
 29
 In Orloff v. Willoughby, supra, 345 U.S. at 93-94, 73 S.Ct. at 540 (1953), the Court, after noting that "judges are not given the task of running the Army," stated that "the responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates." This has been done in Art. 138 of the Uniform Code of Military Justice. We do not sit as a super-Judge Advocate General to review determinations under that Article, see 5 U.S.C. § 701(b) (1) (F). Whether Cortright has any remedies in the Court of Military Justice is not our concern.
 
 
 30
 We began by referring to Orloff v. Willoughby, supra, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842, as the Supreme Court decision most closely in point, and we now return to it. Orloff had been drafted under a special statute authorizing conscription of certain "medical and allied specialists categories," beyond the age at which military liability ceased for those not within such categories. He was denied the commission — which otherwise would clearly have been granted him — because of his refusal to execute a loyalty certificate and his lawful exercise of his Fifth Amendment right not to answer questions whether he had belonged to organizations on the Attorney General's list. The Court refused to order that he be either commissioned or discharged, and also declined to review — on habeas corpus — his claim that the Army was improperly restricting his duty assignments within the generalized medical area. The Court reasoned, at 345 U.S. 94, 73 S.Ct. at 540, that:
 
 
 31
 The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army be scrupulous not to intervene in judicial matters.
 
 
 32
 If civilian courts are not to interfere with the Army's refusal of a commission or desired duty orders when the refusal represents a reaction to the soldier's exercise of his Fifth Amendment rights, then they have even less basis for interfering with a transfer which comes in response to action which, whatever Cortright may have thought, went beyond rights accorded him by the First.[11]
 
 
 33
 Although the district court regarded Orloff as both the "peak of this reluctance to intervene" and "the beginning of a decline," we find scant evidence of any decline in the precise field here at issue. Indeed, the student comment to which the judge pointed as showing a decline states:
 
 
 34
 When it is clear that the military has not exceeded its statutory authority — as by assigning an individual an entirely improper general field — its exercise of discretion within the purview of such authority — as in the determination of particular duty assignments — is not reviewable.
 
 
 35
 Note, God, the Army, and Judicial Review: The In-Service Conscientious Objector, 56 Calif.L.Rev. 379, 429 (1968) (emphasis is original; footnote omitted). Also Chief Justice Warren, in a lecture delivered nearly a decade after the Orloff decision, reiterated that "So far as the relationship of the military to its own personnel is concerned, the basic attitude of the Court has been that the latter's jurisdiction is most limited." The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 186 (1962).
 
 
 36
 Appellees assert that rescinding Cortright's transfer and the other relief directed by the district judge were needed to avoid a "chilling" of the right of Cortright and others to protest against the war in Vietnam, although the transfer to Texas concededly has not chilled Cortright. But any such order would have to rest on a conclusion of illegality in Cortright's transfer, and such a conclusion would not be warranted. While the portion of the order directing display of the DOD Directive on Dissent would not seem practically objectionable, it also falls, under the long recognized principle "that a court of equity will not enjoin one from doing what he is not attempting and does not intend to do." New Standard Publishing Co. v. FTC, 194 F.2d 181, 183 (4 Cir. 1952).
 
 
 37
 As stated at the outset, we are far from holding that under no circumstances could a civilian court interfere with a transfer order or prescribe other relief if that were needed to prevent abridgement of a soldier's First Amendment rights. We hold only that the Army has a large scope in striking a proper balance between servicemen's assertions of the right of protest and the maintenance of the effectiveness of military units to perform their assigned tasks — even such a relatively unimportant one as a military band's leading a Fourth of July parade, and that its actions here did not overstep these bounds. Any other holding would stimulate "the flood of unmeritorious applications that might be loosed by such interference with the military's exercise of discretion and the effect of the delays caused by these in the efficient administration of personnel who have voluntarily become part of the armed forces," of which we spoke in Schonbrun, supra, 403 F.2d at 375. Judicial interference with transfer orders valid on their face must await a stronger showing than Cortright's.
 
 
 38
 The order is reversed, with instructions to dismiss the complaint.
 
 
 
 Notes:
 
 
 [1]
 The record sheds no light on whether this in fact occurred
 
 
 [2]
 Cortright testified that one or two days before the parade, another Band member, Specialist Lovallo, told him "that his wife and various other wives of members of the band intended to have a small demonstration against the war in Vietnam at this parade"; that on the day before the parade Lovallo told him to tell his fiancée to "get involved in this parade"; and that he did
 
 
 [3]
 It is not disputed that General Higgins administered such a reprimand to Flores
 
 
 [4]
 He had already been at Fort Wadsworth nearly a year beyond the period stated in his agreement and had little more than a year to serve
 
 
 [5]
 "Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon."
 
 
 [6]
 Another intervenor withdrew when he received a transfer to Germany
 
 
 [7]
 Insofar as the district court may be taken to have found otherwise and to have held that the Army's actions were directed at Cortright's having signed the November 1969 and circulated the spring of 1970 petition, we would be obliged to regard any such findings as clearly erroneous
 
 
 [8]
 On the other hand, the Court has upheld a conviction of civilians for holding a religious meeting in a public park without a permit, under an ordinance construed as merely calling "for the adjustment of the unrestrained exercise of religions with the reasonable comfort and convenience of the whole city," saying: "The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction." Poulos v. New Hampshire, 345 U.S. 395, 405, 73 S.Ct. 760, 766, 97 L.Ed. 1105 (1953). Relying on that decision, we have sustained a regulation promulgated by what was considered to be a state university for the purposes at issue, for the discipline of students who had disrupted a ceremony for the conferring of awards on members of an ROTC unit. Powe v. Miles, 407 F.2d 73, 85 (2 Cir. 1968)
 
 
 [9]
 While Cortright now claims he did not know just what the women would do, the Army would not have been required to credit this. Moreover, a commander could legitimately determine that if soldiers were telling their present and prospective wives to "get involved" in the parade, they were bound to tell them not to "get involved" by seeking to march with the Band — action that would inevitably cause other members of the Band, participants in the parade, and spectators, to regard such involvement as planned by Band members
 
 
 [10]
 The lack of any vindictiveness on the part of General Ciccolella is demonstrated by his transfer of Cortright to another safe berth in the United States rather than to Vietnam or even to Korea
 
 
 [11]
 While there are passages in the Orloff opinion, 345 U.S. at 87-88, 73 S.Ct. 534, suggesting that the Court might have acted if the Army had refused to give Orloff duties within the medical field, this cannot assist Cortright. The Army respected his contract for enlistment only in a military band
 
 
 OAKES, Circuit Judge (dissenting):
 
 39
 A war unpopular with many people, including soldiers, presents the courts with complicated new problems.[1]
 
 
 40
 This difficulty seems evident to me in the majority opinion which relies heavily upon Orloff v. Willoughby, 345 U.S. 83, 93-94, 73 S.Ct. 534, 97 L.Ed. 842 (1953), for the proposition that the courts shouldn't interfere with internal military matters on the one hand, while suggesting that if the appellee had made "a stronger showing" or had "a stronger case than this one" we might interfere. If we do not have the power to interfere with military transfer orders or other similar discipline, I believe we should say so, and be done with it. But if we do have such power then it seems to me we must abide by a trial court's findings, even when they interfere with the military, unless they are "clearly erroneous," Rule 52(a), Fed.R.Civ.P. These findings, and the trial court's well reasoned and persuasive conclusions of law, are set forth in published form, Cortright v. Resor, 325 F.Supp. 797 (E.D.N.Y.1971).
 
 
 41
 Do the courts have the power to interfere with military proscription of basic civil rights when exercised by soldiers off duty? The Government has conceded that by joining the armed forces a citizen does not surrender all of his First Amendment rights. DOD Directive 1325.6, "Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces," and DOD Directive 1344.10, "Political Activities by Members of the Armed Forces." Certainly employment by the Government in and of itself does not result in total relinquishment of First Amendment rights. Pickering v. Board of Education, 391 U.S. 563, 568-570, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Fahy, J., dissenting in Turner v. Kennedy, 118 U.S.App.D.C. 104, 332 F.2d 304, 307 cert. denied, 379 U.S. 901, 85 S.Ct. 189, 13 L.Ed.2d 175 (1964); Swaaley v. United States, 180 Ct.Cl. 1, 376 F.2d 857 (1967); Steck v. Connally, 199 F.Supp. 104 (D.D.C.1961). See also Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822 (1968). While it may be true, in Professor Emerson's phrase, that the principles governing a civilian system of freedom of expression do not necessarily govern in a system of military operation, that "does not imply that the First Amendment has no application to the military system." Emerson, The System of Freedom of Expression 210-11 (1970). This court has itself protected First Amendment rights of draftees. Wolff v. Local Board No. 16, 372 F.2d 817, 820 (2d Cir. 1967). See also Breen v. Selective Service Board No. 16, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970); Oestereich v. Selective Service System Local Board No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). The military, it would seem, is subject to some of the Constitution. Yahr v. Resor, 431 F.2d 690 (4th Cir. 1970); Dash v. Commanding General, 307 F. Supp. 849 (D.S.C.1969), aff'd, 429 F.2d 427 (4th Cir. 1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (Mar. 22, 1971); Locks v. Laird, 300 F.Supp. 915 (N.D.Cal.1969). See also Kiiskila v. Nichols, 433 F.2d 745 (7th Cir. 1970) (en banc) (civilian employee of Army base credit union may not be prohibited from distributing antiwar literature near base or from on-base conversation with officer).[2] This is a case unlike United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969), where only an abuse of military discretion was claimed. Here we are dealing with freedom of expression, still a most basic constitutional right. New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (June 30, 1971).
 
 
 42
 Soldiers must be held to have basic civil rights, including those of petitioning the Government for a redress of grievances and speaking freely off-duty. The Government here, as has been said, doesn't really argue that soldiers don't have these basic rights, at least off-duty, but this is still the fundamental question. It must be answered in the affirmative for the safety of the country: a Specialist Cortright and a General Gavin must equally be permitted to persuade the public, the Congress or the Executive that, for example, a given course of military-diplomatic action or foreign policy is wrong. See New York Times Co. v. Sullivan, 376 U.S. 254, 269-270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Dash v. Commanding General, 307 F. Supp. 849 (D.S.C.1969), aff'd, 429 F.2d 427 (4th Cir. 1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1971); L. Hand, Sources of Tolerance, quoted in The Spirit of Liberty 66, 82 (Knopf 1952); cf. Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed. 2d 1408 (1957).
 
 
 43
 With the premise that the courts do have some power to interfere even with a military restriction on First Amendment rights under proper circumstances, we may then address ourselves to the question of what the proper circumstances are for such interference. It is plain, and conceded, that they are not the same as in the case of a civilian exercise of freedom of expression. Emerson, supra, 210-11. There is an obvious difference, first, between utterances relating to the performance of the particular job of the soldier or the functions of his unit on the one hand and expressions not connected with his job on the other. See Emerson, supra, 568. Thus it would plainly be, and I trust the majority would concede it, improper for the military to interfere with a soldier's protest of governmental civil rights policies in general, expressed, say, in a newspaper advertisement.[3] Is off-duty dissent to the Government's policy in waging war[4] by a soldier so intimately connected with a military man's job that in and of itself such dissent constitutes interference with that job? I think not, since comment on war policy is on a matter of public concern, at least where the comment is fair, that is to say not knowledgeably erroneous in fact or in reckless disregard of the truth. Cf. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Whether such a comment may in and of itself lead to "intolerable disharmony," warranting discipline, as suggested in Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822 (1968) (aff'd en banc May 12, 1969),[5] need not be spelled out in this case, in view of the findings of the court below.
 
 
 44
 It is not, I believe, our duty or our privilege to reconstruct the evidence in our own mould. Rather, we are to take the evidence in the case given to us by the trial judge, who has seen and heard the witnesses and has had the first hand observation for which the printed page is no substitute. The Rules of Civil Procedure say so. Rule 52(a), Fed.R. Civ.P. The cases from this circuit say so. E. g., Gruja v. United States Lines Co., 337 F.2d 375 (2d Cir. 1964). For perhaps the best recent exposition of the appellate court's function, Lundgren v. Freeman, 307 F.2d 104, 113-115 (9th Cir. 1962), may be referred to:
 
 
 45
 * * * we may not substitute our judgment if conflicting inferences may be drawn from the established facts by reasonable men, and the inferences drawn by the trial court are those which could have been drawn by reasonable men. 307 F.2d at 113.
 
 
 46
 The majority opinion, as I read it, relies almost exclusively on the July 4 incident involving four wives of band members and Cortright's fiancee to justify the interference with freedom of expression here.[6] The majority condemns the plaintiffs for "sanctioning" and "arranging for" the women to accompany the band on its July 4 parade. In doing so, it assimilates the July 4 26th Army Band march to the stink bomb and brick-throwing (and presumably the women's protest to the anti-Semitic speech of the defendant) in Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed.2d 1131, (1949), the majority here saying "this is precisely the area where a soldier, when wearing his uniform and performing a military assignment with his unit, may be subjected to discipline for contributing to disorder, to which a civilian could not." The thoughtful findings of Judge Weinstein below justify no Terminiello analogy or allusion:
 
 
 47
 The only instance where significant non-verbal conduct was involved was the off-post demonstration of five women on July 4, 1970. Neither the Article 138 Proceeding nor the trial revealed that they were acting otherwise than on their own behalf. Cf. Kiiskila v. Nichols, 433 F.2d 745 (7th Cir. 1970) (en banc) (right of civilian anti-war proponent to come on to post). Nor was there any evidence that anyone in the Band acknowledged their presence or participated in any way in their activity. Holding men responsible for the activities of wives or sweethearts, without proof of any other connection, is hardly consonant with due process. The only activities the members of the Band participated in, and which were found objectionable by their superiors, were the circulation and signing of the petitions. 325 F.Supp. at 823 (emphasis supplied).
 
 
 48
 Contrary to the majority's findings de novo here, the court below made findings, and I believe we are bound by them, as follows:
 
 
 49
 As the Band was about to march in a July 4th parade on Staten Island, five women — Cortright's fiancee and the wives of some other Band members — attempted to join the line of march while carrying "peace" signs. Although a scuffle occurred between the women and some spectators, the Band continued to march in formation and play. This incident was reported in a Staten Island newspaper. No signs connected the Band with the demonstration. 325 F.Supp. at 801. * * * Restrictions on speech were not based upon any person's special access to information. * * * 325 F.Supp. at 823.
 
 
 50
 Third, the investigating officer uncovered no criticism or disrespect for superiors either civilian or military. * * *
 
 
 51
 * * * This was no call to rebellion or riot; it was not a call to civil disobedience of any kind. If these men had not been soldiers, their right to carry on these activities would be unquestioned.
 
 
 52
 The facts, both as elicited from the record of the Article 138 Proceeding and as developed at the trial, demonstrate that the changes in duty assignments of the Band as a whole were for the purpose of halting the public expressions of disagreement with the Vietnam War of Band members. * * *
 
 
 53
 On the record in the Article 138 Proceeding there was no substantial evidence to support the findings and conclusion reached by the investigating officers and accepted by General Seaman and the Secretary of the Army. On the contrary, the record establishes that the changes in duty assignments of the Band were for the purpose of halting speech. * * * 325 F.Supp. at 824.
 
 
 54
 Accepting the trial court's findings referred to above, and the premise that a "service member's right of expression should be preserved to the maximum extent possible, consistent with good order and discipline and the national security,"[7] it seems to me that the conclusion is inevitable that the courts must intervene to protect the "service member's right of expression." What form that intervention should take, however, is an even more difficult question to me than the basic question of whether such intervention should occur. It is not as if the band members were directly disciplined, court martialed or deprived of pay or other benefits.
 
 
 55
 To what extent, then, may military transfer orders be interfered with by the courts?[8] Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed.2d 842 (1953), nearly puts revision of duty orders of one lawfully in the service out of judicial reach; at least it says that the judiciary must be "scrupulous not to interfere with legitimate Army matters. * * *" 345 U.S. at 94, 73 S.Ct. at 540. The legitimate exercise of First Amendment rights is, however, not exclusively an Army matter, as has been pointed out, even though that exercise is by one in the military service. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), is still good law where there has been actual harassment, as found here by the trial court, despite Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Even a very little chill on a very big right is too much. A transfer to Texas today could be a transfer to Hue tomorrow.[9] A transfer can be just as much "punishment" as retention in the Army. See Black, J., dissenting in Orloff, supra at 97, 73 S.Ct. 534.
 
 
 56
 An almost equally difficult problem here is whether the court below was bound by the Article 138 proceeding. In other words, to what extent are the courts bound by military proceedings below? In this respect I agree with the conclusions of the learned trial judge, 325 F.Supp. at 819-820. Here, where the exercise of constitutional rights is involved, I believe the courts may review military findings in substance and effect; those findings stand no higher than the Alabama state court's findings of no systematic exclusion of blacks from Alabama jury rolls. Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). See also Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938 (1922). Here is just such an erosion of First Amendment rights as was referred to in Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 822 (2d Cir. 1967). The lack of the usual safeguards of counsel, cross examination and the submission of evidence doesn't make the Article 138 proceeding record here any more appealing to me as one requiring binding effect than the lack of any administrative record in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), was appealing to the Court there. "Post hoc rationalizations" are not a basis for administrative action's binding the courts. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 
 
 57
 The majority would await a "stronger case" to intervene to protect a serviceman's First Amendment rights. I suspect that there were those who counselled waiting for a higher tax to throw the tea into Boston Harbor, or suggested to Andrew Hamilton that he wait for a client with a better case than John Peter Zenger's to argue for free expression. I would, rather, agree with Coke's aphorism: "No restraint be it never so little, but is imprisonment, and foreign employment is a kind of honourable banishment." 4 D.N.B. 693 (Oxford Univ. Press 1921 reprint).
 
 
 
 Notes:
 
 
 [1]
 See New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (June 30, 1971)
 
 
 [2]
 Former Chief Justice Warren has said nothing to the contrary: "When the authority of the military has such a sweeping capacity for affecting the lives of our citizenry, the wisdom of treating the military establishment as an enclave beyond the reach of the civilian courts almost inevitably is drawn into question." Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 187-188 (1962)
 
 
 [3]
 See Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Emerson, The System of Freedom of Expression 569 (1970)
 
 
 [4]
 See Douglas, J., in New York Times Co. v. United States, supra 403 U.S. at 722, 91 S.Ct. 2140, 29 L.Ed.2d 822 (June 30, 1971), and Brennan, J.,id. at 726, 91 S.Ct. at 2146.
 
 
 [5]
 This opinion is carefully and constructively criticized in Emerson,supra n. 3, at 567-568.
 
 
 [6]
 "We see no basis for concluding that if Cortright and his like-minded friends had limited themselves to signing peace petitions or engaging in protest marches while on leave, the Army command would have interfered in any way." "What triggered the difficulties here was the prearranged participation of Cortright's fiancee and the four wives in the July 4 parade. While these ladies had every right to engage in a protest march of their own and carry such signs as they wished, it does not follow that Band members were entitled to arrange for or to sanction their accompanying the Band when it was performing its mission of leading a Fourth of July parade."
 
 
 [7]
 DOD Directive 1325.6, "Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces," quoted with apparent approval in the majority opinion
 
 
 [8]
 Here the court denied injunctive relief to the plaintiffs and merely ordered posting of the Army's own Guidelines on dissent and protest and of a brief summary of the court's own findings and conclusions and ordered rescission of Specialist Cortright's transfer to Texas
 
 
 [9]
 Indeed, five intervenor members of the band were transferred in 1970 to Vietnam and Korea but the trial court found no relation between their transfer and their exercise of freedom of expression. 325 F.Supp. at 806-807