William Michael O'SHEA, Plaintiff,

v.

Joseph J. BLATCHFORD, Director of the Peace Corps, Defendant.

No. 70 Civ. 5747.

United States District Court,
S. D. New York.

Aug. 7, 1972.

Karpatkin, Ohrenstein & Karpatkin, New York City, by Marvin M. Karpatkin and Michael N. Pollet, New York City, of counsel, and American Civil Liberties Union Foundation, by Melvin L. Wulf and Joel M. Gora, New York City, of counsel, for plaintiff.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, by Gerald A. Rosenberg, New York City, of counsel, for defendant.

GURFEIN, District Judge.

This is a motion by the plaintiff William Michael O'Shea for summary judgment pursuant to Fed.R.Civ.P. 56. O'Shea is an engineer with an advanced degree in Asian studies who was a Peace Corps Volunteer from December 1968 to January 1970, when his services were terminated under the circumstances described below. He served as a science teacher in the Government Junior Secondary School in Kota Kinabalu, Sabah (North Borneo, Malaysia) from 1968 until his termination.

The defendant is Director of the Peace Corps. The relief sought is: (1) a declaratory judgment that Peace Corps Manual Section 237.1 is unconstitutional on its face and as applied to the plaintiff [1]; (2) a declaratory judgment that his early termination was in violation of his rights under the Constitution and Peace Corps Manual Section 292; [2]  (3)

---

[1]. Peace Corps Manual § 237.1, ¶ VIII (1968):

"Any incident involving a trainee or Volunteer in the cultivation, manufacture, traffic, or unauthorized use of drugs is considered grounds for his immediate return to Washington and termination. Not only is such involvement illegal in most countries; in every case, the consequences could be explosive and could seriously jeopardize the entire Peace Corps program. In view of the potentially serious implications of such incidents for the Peace Corps, the Regional Director or Director of OVS should, in every case, bring any violation of this policy to the personal attention of the Director."

[2]. The respects in which Peace Corps Manual § 292 (1970), relating to early termination procedure, were allegedly disregarded are that (a) there was no prior discussion with plaintiff or his host country supervisors; (b) the Country Director failed to present his written detailed decision to plaintiff; (c) plaintiff was not given an opportunity to submit his own statement; (d) the Country Director did not recommend Peace

an order directing that the plaintiff be reinstated into the Peace Corps and reassigned to his volunteer post in Kota Kinabalu; (4) an order requiring the defendant to correct the plaintiff's record, expunging his "unlawful dismissal" and reflecting that his termination was unlawful; and (5) other and further relief. The defendant opposes the motion for summary judgment but makes no cross-motion.

The facts are not in dispute. While O'Shea was a teacher in Borneo his work was excellent and he was well regarded by his superiors in the Peace Corps and by the Peace Corps staff and the residents of the host country. Soon after his arrival in Borneo O'Shea became troubled by the fact that several other Volunteers had been terminated for smoking marijuana, although O'Shea himself was concededly not a smoker. On December 1, 1969, he left Borneo for a month's vacation in the United States. In January 1970, while en route back to his post he stopped in Kuala Lumpur to speak with the Peace Corps Country Director for Malaysia, John Pincetich. He told Mr. Pincetich that he wished to do a survey among the Peace Corps Volunteers in Malaysia to get their opinions of the Peace Corps "regulation" prohibiting the use of marijuana and to gather statistics about its use or non-use by Volunteers.[3] The Country Director did not object to the survey, but suggested that it be limited to the Volunteers in Sabah and that the results be sent to Peace Corps/Malaysia and Peace Corps/Washington.

O'Shea prepared a letter to accompany the survey for mailing to the Volunteers in Sabah. When he presented the material on January 14, 1970 to the Peace Corps office for such mailing, it came to the attention of Baudouin de Marcken, then the Associate Country Director for Malaysia, and it was never circulated. The letter included the following statement:

"Recently, while I was drunk, I had my first and only 'weed.' The next day, after I recovered from my alcohol hangover (the marijuana seemed not to effect [sic] me), I realized that I had, in the eyes of the Peace Corps, committed an extremely serious offense. And yet I didn't feel like a criminal."

The plaintiff was called into de Marcken's office the next day and told that because of the foregoing portion of the letter the plaintiff was subject to being summarily terminated as a Peace Corps Volunteer, since he had violated the regulation pertaining to marijuana. The matter was put up to Leo Moss, the new Country Director, who ordered O'Shea's termination.[4] O'Shea was not given a written detailed decision, nor an opportunity to submit his own written statement; nor did the Country Director recommend consultation in Washington, in accordance with Section 292 of the Peace Corps Manual.

The plaintiff went to Washington on his own initiative but obtained no relief. The "case summary" in the Peace Corps file reads in part:

The event which precipitated his abrupt departure was his intent to distribute to all Sabah PCV's[5] a mimeographed statement and questionnaire describing his single use of marijuana

Corps/Washington consultation for plaintiff as required in a "use of drugs" termination; and (e) the Agency decision has not been formally communicated to plaintiff.

3. The "regulation" is not in the Code of Federal Regulations, but appears in different forms in the Handbook and the Manual issued by the Director of the Peace Corps. Both parties assume that it has the force of a published regula-

tion. See 5 U.S.C. § 552(b) (2); 44 U.S.C. § 1505; cf. Service v. Dulles, 354 U.S. 363, 382 & n. 29, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

4. As the defendant's Local General Rule 9(g) statement put it: "Moss erroneously believed that he had the power (as well as the duty) to terminate O'Shea for violation of the Peace Corps regulation."

5. Peace Corps Volunteers.

and soliciting each Volunteer's statement regarding use of marijuana and opinions on discrimination against Chinese students in Sabahan schools. Leading up to his proposed distribution of his questionnaire, however, was Michael's frequently voiced opinion over a period of several months· that Peace Corps policy on drug use is both incorrectly based and unfairly implemented. He intended to use the results of his survey as part of an appeal to the Director of the Peace Corps for a major change in the policy. Michael undertook this project despite the fact that he is not himself a user of any drugs. The issue of discrimination against the Chinese was an afterthought.

Peace Corps/Malaysia took the position that they could not disregard Mike's openly written statement even though his performance as a Volunteer had been excellent and his assurance that he had no intention of ever using any drugs again was beyond question. They informed him that they were bound to enforce the policy requirement of termination since there exists no provision for "mitigating circumstances."

O'Shea was officially terminated from the Peace Corps on March 6, 1970.

The Peace Corps was created by the Congress in 1961 "to promote world peace and friendship through a Peace Corps" by making available United States citizens "to help the peoples of [interested] countries and areas in meeting their needs for trained manpower, and to help promote a better understanding of the American people on the part of the peoples served and a better understanding of other peoples on the part of the American people." 22 U.S.C. § 2501. "The President is authorized to carry out programs in furtherance of the pur-

poses of this chapter, on such terms and conditions as he may determine." 22 U.S.C. § 2502. The statute also provides that "[t]he service of a volunteer may be terminated at any time at the pleasure of the President." 22 U.S.C. § 2504(i).

The President in turn delegated all his powers, except those specifically reserved to himself, to the Secretary of State.[6] The power conferred by the Congress on the President under § 2504(i) was not specifically reserved and, therefore, vested in the Secretary of State. When O'Shea's services as a volunteer were terminated in March of 1970 the Secretary of State had delegated to the Director of the Peace Corps the responsibilities delegated to him by the President.[7] Pursuant to the delegation, the Director promulgated regulations and rules including those governing termination procedures for volunteers.

The Act creating the Peace Corps provided that "except as provided in this chapter, volunteers shall not be deemed officers or employees or otherwise in the service or employment of, or holding office under, the United States for any purpose." 22 U.S.C. § 2504(a). The regulations applicable to such volunteers provide in pertinent part: 22 C.F.R. § 301.735–1(c)—"Any violation of the regulations in this part may be cause for disciplinary action"; § 301.735–2(b)— "Moreover, no regular or special employee may engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government"; § 301.735–6 (c) (1)—"Employees are encouraged to engage in teaching, lecturing, and writing." There is a special requirement for clearance of submissions for publications "which are devoted to the Peace Corps' programs or to any other matter which might be of official concern to the U. S. Government." § 301.735–6(c) (3). There

6. Executive Order No. 11041 § 101(a) (Aug. 7, 1962, printed at 22 U.S.C. § 2501). The current Executive Order is No. 11603 (June 30, 1971, printed at 22 U.S.C. § 2501 (Supp. I, 1971)), which reorganized the Peace Corps.

7. State Dept. Delegation of Authority No. 85–11A, § 2(a) (1) (Aug. 6, 1962; as amended, 27 Fed.Reg. 9074 (1962)).

is a specific prohibition against gambling and there is a reminder of the existence of other statutes, including 5 U.S.C. § 7352 relating to the habitual use of intoxicants to excess. §§ 301.735–12; 301.-735–13(f). There is no specific reference in C.F.R. to any statute relating to the use of marijuana.

In spite of the absence of any published official regulation with respect to marijuana, the Director of the Peace Corps issued a Handbook which in the November 1968 Edition states:

DRUGS

For several reasons the Peace Corps takes a very firm position with regard to the unauthorized possession or use of drugs (including marijuana) by trainees or Volunteers. Drug involvement is grounds for immediate termination from the Peace Corps.

Such activity is illegal in most host countries and Volunteers, of course, are subject to host country laws. Beyond this, the Volunteer's effectiveness could be seriously jeopardized in two ways. Drug use can have detrimental physical and/or psychological effects; and, in any case, public knowledge of drug involvement (including marijuana) could not only impair the individual Volunteer's ability to fulfill his commitment to the host country and the Peace Corps, but could also be damaging to the entire Peace Corps program.[8]

It will be noticed that the prohibition is against possession or use of marijuana —presumably possession in the host country, and "use" meaning a habitual practice of using marijuana.

■ It would be stretching the language beyond its ordinary import to include a drag on a single collective marijuana cigarette while the Volunteer was on vacation in Boston, thousands of miles away. Such a reading would make the rule almost irrational. Nor was there any "public knowledge of drug involvement" in this case. But, even though

O'Shea had taken only a puff or two of a marijuana cigarette while off-duty in Boston, and though his promise not to use the drug again was admittedly "beyond question," the Peace Corps officials apparently acted on the belief that the draconian effect of the Handbook rule, as a matter of law, permitted no discretionary relaxation for "mitigating circumstances." The defendant's brief concedes the issue to be "whether the Peace Corps acted rationally in cashiering plaintiff for his single, admitted use of marijuana while he was on vacation leave of absence" (p. 29).

First Amendment problems aside, the attitude of the officials can hardly be deemed anything other than bureaucratic myopia. They had a fine teacher, liked by the host country people whom they wanted to help. But since they lived by a rule book they felt compelled to remove the fine teacher, who is described in the defendant's brief as "an exemplary Volunteer" (p. 37), from his classroom because he had admitted taking a drag on a marijuana cigarette.

■ We are thus confronted with the question whether a federal district court has a right to interfere with the personnel practices of the Peace Corps where the results are as bizarre as they have been in O'Shea's case. The federal courts should not, of course, try to run the Peace Corps. While the grounds for abstention are perhaps less strong than in the case of intervention in military affairs, see Cortright v. Resor, 447 F.2d 245 (2 Cir. 1971), cert. denied Cortright v. Froehlke, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972), a court should, nevertheless, hesitate as well to interfere in the conduct of foreign relations to which the Peace Corps relates.

There seems to be no question that in its summary termination of O'Shea the Peace Corps failed to follow the "regulations" laid down in its own Manual. The matter was treated on a wholly informal basis, with O'Shea facing a spontaneous adverse decision that had an air of final-

8. Peace Corps Handbook 34 (6th ed. 1968). See also notes 1 and 3, *supra*.

ity about it when he later discussed it in Washington.[9] It put the burden upon him to reverse the spontaneous decision of the Country Director under standards of review which were not at all clear.

The pervasive error, however, was not only procedural in the sense of adequate notice and standards of review. The Country Director, on this record, assumed that the admission by O'Shea, that he had taken a drag on a marijuana cigarette while off-duty in Boston, left him no discretion but to terminate O'Shea. In this respect, he violated his own regulation and the inevitable gloss of old-fashioned common sense on its literal wording.

Even in as sensitive an area of employment as foreign service in the Department of State, the Supreme Court has held that the Secretary of State may not bypass his own regulations. Service v. Dulles, 354 U.S. 363, 382, 77 S.Ct. 1152, 1162, 1 L.Ed.2d 1403 (1957). Mr. Justice Harlan, writing for a unanimous Court, found the question to be "whether the manner of petitioner's discharge was consistent with the Department's Regulations;" and the Court overruled the Secretary, holding that it was not.

In United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954), the Court held that it was wrong for an administrative board to fail to exercise its discretion contrary to existing valid regulations.

And even though an employee did not have tenure and the Secretary of the Interior had the power to discharge him summarily without giving any reason, where the Secretary gratuitously decided to give a reason he was obligated to conform to the procedural standards he had formulated for discharge on the ground of that particular reason. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

The Peace Corps established procedures to be followed in the case of early termination (Peace Corps Manual § 292). In at least the following respects those mandated procedures were not complied with:

(1) The Manual requires in Section 292II(B) (4) that the Country Director "shall present his written decision on the case to the Volunteer." It must contain the reasons and all the factors upon which the decision was based so that the Volunteer can challenge that decision meaningfully. Here, the plaintiff only received a *personal* letter from the Country Director, with a one-sentence statement about the cause of termination.

(2) In addition, the Regulation requires that the Volunteer be afforded the opportunity to submit his own statement to accompany the Country Director's decision. Manual § 292II(B) (5). No such opportunity was provided.

(3) Section 292II(C) (1) states that the "Country Director shall recommend [Peace Corps/Washington] consultation to any Volunteer . . . terminating because of . . . use of drugs . . ." The defendant's Answer admits that plaintiff proceeded to Washington on his own initiative; Peace Corps officials in Malaysia had ticketed plaintiff home to New York.

The failure of the Peace Corps to follow its own procedural rules for termination has been held to be a violation of due process of law. Murray v. Blatchford, 307 F.Supp. 1038, 1051–1053 (D. R.I.1969).

In this case, it is not correct to assume, as the defendant contends, that no other result was, in any event, possible in view of O'Shea's admission that he had puffed a marijuana cigarette while on leave in Boston. The implicit assumption in the argument that more formal or prolonged procedure would have made no difference is that there was no dis-

9. It is one thing to deal in formal appellate or administrative review where it is no disrespect to the lower echelon to reverse it, and quite another to resort to informal procedures where "discipline" may suggest inordinate respect for the personal command decision of the Country Director.

cretion whatever to recognize mitigating circumstances or the plaintiff's excellent record as a teacher. That assumption cannot survive analysis. The regulation did not mandate categorical punishment, for it spoke in terms of "grounds for . . . termination." Furthermore, as to the smoking of marijuana, the proscription was to "use" of marijuana or "involvement" with marijuana. The plaintiff surely could have argued that the casual incident in Boston, coupled with his promise to abstain in future, was not a "use" of marijuana within the meaning of the prohibition. And he certainly could have argued that he was not "involved" with marijuana in the plain meaning of the word.[10] He might have elicited, moreover, by means of a more formal proceeding, any overtones that chilled First Amendment rights, or at least elicited them to the point of determining whether a First Amendment issue exists. When the Country Director in an unconsidered reaction took the rule to apply to O'Shea's admitted infraction without more, he was acting without the authority of law. By then failing to adhere to the simple rules concerning termination, he compounded his own mistake of judgment.

If the Peace Corps Director had acted under his power to dismiss "at his pleasure," this Court would have abstained; but he purported to act under the compulsion of a supposedly inexorable rule, and without following his own procedural rules.

If only mistake of judgment were involved, it would also be outside the province of this Court. But the mistake was based on an erroneous view of the discretion the Director must exercise and gave no chance to O'Shea properly to argue his point in the calm atmosphere that pervades a more formal proceeding.

Jurisdiction is asserted under 28 U.S.C. § 1331, although the jurisdictional amount is controverted, and under 28 U.S.C. § 1361, the mandamus statute. There is jurisdiction under the latter without question. While mandamus does not serve to order an official to do a discretionary act, it does lie where the official has failed to follow his own regulations. Feliciano v. Laird, 426 F.2d 424, 427 (2d Cir. 1970); see Smith v. Resor, 406 F.2d 141, 146–147 (2d Cir. 1969).[11]

In the case at bar, the relief sought must be fragmentized. The plaintiff is entitled to a judgment declaring that his early termination by the Peace Corps was in violation of his rights to due process of law under the Fifth Amendment and of his rights under Peace Corps Manual § 292. Following upon that, he is also entitled to an order requiring the defendant to correct the plaintiff's record, expunging his unlawful dismissal and reflecting that the termination was unlawful.

However, the plaintiff now has a civilian job. He may feel that the above relief is sufficient for his vindication. If he chooses to pursue his quest for reinstatement, that should be done in the Peace Corps. The Director of the Peace Corps (or his statutory successor) is advised that he has discretion in the matter and is ordered to reconsider the termination of the plaintiff in conformity with this opinion. This Court would, in any event, be reluctant to tell the Peace Corps where to send the plaintiff, for that is a function of administration, especially where foreign relations policy is involved.

The matter will, in all likelihood, become moot, either if the Peace Corps grants reinstatement, or if the plaintiff is satisfied with this Court's order and chooses not to avail himself of the admin-

---

10. The plaintiff could have similarly argued the inapplicability of Peace Corps Manual § 237.1.

11. In view of the disposition under 28 U.S.C. § 1361 the matter may become moot, as described below. If it does not, there will be time to consider whether there is also jurisdiction under 28 U.S.C. § 1331. The plaintiff pleads damages in the jurisdictional amount and claims the loss of prospective jobs because of the Peace Corps termination.

istrative remedies within the Peace Corps. Nevertheless, the action remains pending. If it should not become moot, there will be time to consider the other constitutional issues at trial upon an evidentiary record. At any rate, those constitutional claims need not be decided now in view of the relief afforded to the plaintiff.[12]

Submit order on five days' notice.

---

12. Moreover, as to some of these other constitutional issues, issues of fact remain, e. g., whether the early termination of O'Shea was prompted by the desire to "chill" his right of free speech or was simply based on the mistaken notions above mentioned without any motives of censorship.