The **FIFTH AVENUE PEACE PARADE COMMITTEE, an unincorporated association, et al., Plaintiffs-Appellants,**

v.

L. Patrick **GRAY** 3rd, Acting Director of the Federal Bureau of Investigation, et al., Defendants-Appellees.

No. 546, Docket 72–1439.

United States Court of Appeals, Second Circuit.

Argued March 14, 1973.

Decided June 12, 1973.

█ Oakes, Circuit Judge, dissented and filed opinion.

Arthur M. Handler, New York City (Donald D. Shack, Richard M. Resnik, Barry H. Mandel, New York City, and Burt Neuborne, New York Civil Liberties Union, New York City, of counsel), for plaintiffs-appellants.

Daniel Riesel, Asst. U. S. Atty, New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., and Dennison Young, Jr., Asst. U. S. Atty., New York City, of counsel), for defendants-appellees Gray and Malone.

Alan G. Blumberg, New York City (Szold, Brandwen, Meyers & Altman, New York City, of counsel), for defendant-appellee Amalgamated Bank.

Before HAYS, MULLIGAN and OAKES, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal by the Fifth Avenue Peace Parade Committee, Deborah D. Weisburd and Robert H. Silk, from a judgment of the United States District Court for the Southern District of New York, entered on February 16, 1972, after a non-jury trial before Hon. Harold R. Tyler, Jr., dismissing their complaint on the merits. Essentially plaintiffs complained that an FBI investigation conducted immediately prior to the November 14–16, 1969 Moratorium Demonstration in Washington, D.C. and the dissemination of the FBI reports of this investigation to various other Government agencies, has and will continue to have a chilling effect upon the exercise of their constitutional rights and further constituted an illegal search and an invasion of privacy. Judge Tyler dictated his findings of fact and conclusions of law into the record at the conclusion of the trial. We affirm.

The Fifth Avenue Peace Parade Committee functioned as an umbrella organization for some one to two hundred anti-war groups in the New York metropolitan area. Its purpose was to organize meetings and demonstrations protesting the American military involvement in Southeast Asia. The Committee publicized its program widely in the press and through the distribution of flyers and leaflets. The work of the Committee was supported by contributions generally in the range of $1 to $10.

The Committee was deeply involved in the preparations for the November, 1969 Moratorium Demonstration in Washington, the purpose of which, as explained by the Committee's Coordinator, Norma Becker, was "to make visible . . . public opposition to the war in Vietnam and to dramatize public desire for withdrawal of American troops from Vietnam." Several hundred "marshals" were recruited and trained to keep the demonstration safe and orderly. To provide transportation to Washington, the Committee hired some six hundred busses and three or four trains, and sold tickets to members of its various affiliated organizations and to the general public. The receipts from the ticket sales were deposited in a special account with the defendant Amalgamated Bank of New York (the "Washington Transportation Fund").

In Washington another "umbrella" organization, the New Mobilization Committee, with which the Fifth Avenue Peace Parade Committee was affiliated, was conferring with Government officials about the logistics for the planned demonstration. The New Mobilization Committee attempted to keep the Government accurately apprised of the number of people expected to participate in the demonstration. It did this by soliciting frequent reports of the number of busses and trains chartered by the various anti-war organizations around the country. As might be expected the preliminary estimates continuously varied and eventually proved somewhat inaccurate.[1]

The Washington Headquarters of the FBI initiated its own investigation, the purpose of which according to the Special Agent in charge, Philip H. Wilson, was "to know who was coming, how many were coming, mode of transportation, arrival, when they expected to leave Washington, any individuals that had a potential record of violence, or who might threaten the President's life, or a Cabinet member, or anything of that nature." The Bureau's New York office was directed to determine the size, nature and scope of the local Moratorium activities. Special Agent Robert Casper, the coordinator of this local investigation, assigned Agent Constantino to check the Washington Transportation Fund account to get an early estimation of how many buses and trains could possibly be hired by the Committee. On November 6, Constantino visited the defendant Amalgamated Bank and was allowed to inspect the Fund's new account sheet and signature cards and was advised the account's opening balance. Although he did not request it, Constantino was orally given similar information about an account opened by the "Labor Committee to Support Washington Action" whose coordinator, Deborah D. Weisburd, is a named plaintiff in this class action.

Agent Constantino reported orally to his supervisor, Casper, that he had located the account, the amount of money it contained and the names of the individuals listed on the signature cards. The District Judge found that Constantino's information was transmitted to the FBI's Washington Headquarters. Con-

---

[1]. The counsel to the New Mobilization Committee testified that just prior to the Moratorium weekend he told the Government personnel that his reports indicated some 250,000 people were expected to participate. At trial he estimated that between 500,000 and 750,000 were present on Saturday, November 15. Undoubtedly part of this discrepancy was due to the fact that not all demonstrators chose to use the transportation facilities provided by the various anti-war organizations.

stantino subsequently dictated a report of his findings on November 13; this report was transcribed on an FD–302 form on November 19.[2] No agent attempted to examine or to copy any checks deposited in the Washington Transportation Fund's account nor was any attempt made to compile a list of the checks' drawers.

Casper had also assigned Agent Albert Faller to find out the number of busses reserved by the Fifth Avenue Peace Parade Committee and their departure points. Faller's only inquiry was to the Allied Bus Company which gave him this information. On the morning of November 15, some fifty-six agents observed the bus departures, from 57 locations in New York City. Their "surveillance" consisted in counting the busses and the passengers leaving the city. The FBI made no attempt to photograph or to compile a list of the passengers. The information provided by the agents was immediately forwarded to Agent Wilson in Washington. Prior to and during the demonstration, the FBI's Washington office disseminated the information its agents had gathered to various local and Federal governmental agencies in the Washington

area.[3] The Bureau's New York office maintained a file for all the information it had collected on the Moratorium. In January 1970, a classified 200 page summary of that voluminous file was prepared and subsequently disseminated to various governmental agencies.[4]

Plaintiffs learned of Agent Constantino's visit to the Amalgamated Bank sometime *after* the Moratorium Demonstration when an official of the Allied Bus Company, who was attempting to have one of the Committee's checks certified, was told that the FBI had investigated the Washington Transportation Fund account. He relayed this information to the Secretary of the Fifth Avenue Peace Parade Committee and its attorneys. These facts, in turn, were transmitted to various individuals who were involved in the Moratorium activities. On June 22, 1970 plaintiffs commenced this litigation by filing a complaint alleging, upon information and belief, that the FBI had examined and photocopied the bank records of the Washington Transportation Fund as well as checks deposited in that account; had compiled a list of persons who had paid for their transportation tickets by check; had examined and copied the

2. The FD–302 contained the names of the officers of the Peace Parade Committee and of the Labor Committee to Support Washington Action who were authorized to sign checks for their respective organization's account. The opening balance of each account was also listed. Both accounts were opened on October 29, 1969—a few weeks before the Moratorium Demonstration.

3. The following agencies received information from FBI Headquarters prior to and during the demonstration: the Department of Justice, whose Attorney General oversees preparations for potential civil disturbances; the D.C. Metropolitan Police, who were charged with controlling traffic; Police Departments in various counties surrounding Washington, through whose jurisdictions the demonstrators were expected to pass; the Army's 116th Military Intelligence Group, whose responsibility is to keep order during civil disturbances; the United States Secret Service, whose responsi-

bility is to protect the President and the White House; the United States Park Service, which is charged with protecting parks and streets; the General Services Administration which has a general responsibility to protect Government buildings; the State Department which has been ·the target of previous demonstrations and which has its own security force; the Navy and Air Force which protect their own installations and recruiting stations, and the Internal Revenue Service whose Security Division had inquired whether the Service would be a target of the demonstrators.

4. The summary report was disseminated by FBI Headquarters to the Secret Service, the Department of Justice, the Internal Revenue Service and the Office of Special Investigation of the Air Force. The Bureau's New York office further disseminated the report to the Secret Service in New York City, the 108th Military Intelligence Group and the Naval Investigative Service in New York City.

records of the Allied Bus Company and had also learned the departure points of the busses from the New York area and photographed passengers as they boarded the buses. Finally they alleged that the FBI had these data, photocopies and photographs in its possession. By stipulation in the pre-trial order, the parties agreed to try the question of whether the dissemination of the information was justified in view of the purpose of the investigation, and the complaint was deemed so amended. See Fed.R.Civ.P. 15(b). Plaintiffs claimed that these actions by the Bureau (aided and abetted by the Amalgamated Bank) were an invasion of their constitutional right of privacy and constituted an unlawful search and seizure. They further claimed that these "acts . . . has [sic] and will restrict and inhibit the Individual Plaintiffs and the members of the Class from the lawful exercise of such rights, has and will place them in fear of repression and retaliatory acts by agencies of the United States Government and has and will intimidate, harass and have a chilling effect upon the Individual Plaintiffs and the members of the Class in the lawful exercise of such rights." Plaintiffs sought both a declaration that the defendants' conduct violated their constitutional rights, and an injunction directing the defendants to surrender or to destroy the data, photocopies and photographs allegedly obtained by the Bureau and enjoining the defendants from using these items

"in any manner whatever." Plaintiffs promptly called a press conference to announce the suit and reports of the litigation were contained in the *New York Times* and eventually in the *New York Post*. Judge Tyler subsequently granted plaintiffs' motion to allow the suit to proceed as a class action.[5] After a five day trial in the middle of January and one day in February, Judge Tyler dismissed the complaint on the merits.

The plaintiffs' position both at trial and on this appeal is that the FBI's investigation was overbroad, unauthorized and illegal and that the dissemination of the information it had collected was unlawful. They further complain, *inter alia*, that the trial judge improperly refused to let them depose Agent John Malone of the FBI and to inspect either the previously mentioned file compiled by the Bureau's New York office or the classified summary subsequently prepared.

We believe that this case is governed by Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972),[6] and accordingly we affirm the judgment below on the ground that plaintiffs failed to present a justiciable controversy. In *Tatum*, the several plaintiffs, four individuals and nine unincorporated associations, sued on their own behalf and on behalf of all other individuals and organizations who wish to exercise their First Amendment rights "without fear of harassment, intimidation and injury resulting from investigation, surveil-

---

5. Judge Tyler originally defined the class as

> All persons who purchased "Moratorium Day" tickets (as described in the complaint) and paid for same with their personal checks upon which their names and addresses were imprinted, and which checks were deposited in the so called "Washington Transportation Fund" account maintained at the Amalgamated Bank of New York.

Plaintiffs Weisburd and Silk had purchased their transportation tickets with personal checks deposited in the Washington Transportation Fund account. Pursuant to Fed.R.Civ.P. 23 Judge Tyler subsequently redefined the class to include

all individuals who were acting on behalf of the Fifth Avenue Peace Parade Committee or any of its affiliated organizations.

In an opinion reported at 327 F.Supp. 238 (S.D.N.Y.1971), Judge Tyler ruled, *inter alia*, that the claimed deprivations of constitutional rights satisfied the amount in controversy requirement of 28 U.S.C. § 1331(a). In view of our disposition of this case, we need not pass on that issue. See Aguayo v. Richardson, 473 F.2d 1090, 1101–1102 (2d Cir. 1973).

6. The *Tatum* decision was announced on June 26, 1972, over four months *after* Judge Tyler directed entry of judgment dismissing the complaint on the merits.

lance and record keeping by military authority." (Plaintiffs' Complaint ¶ 5, Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). The complaint alleged that the intelligence agencies of the United States Armed Forces were continually engaged in the surveillance of lawful and peaceful civilian activity, that the information collected concerning the plaintiffs served no legitimate military purpose, was widely and indiscriminately disseminated [7] and was stored in computerized data banks. It further alleged that a "blacklist" of potential troublemakers had been compiled. The plaintiffs claimed that the defendants' activities inhibited and curtailed their free exercise of First Amendment rights and deprived them of their constitutionally guaranteed right of privacy. Since the Supreme Court was reviewing a motion to dismiss on the pleadings, the allegations of the complaint and of the supporting affidavits had to be accepted as true. Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L. Ed.2d 704 (1967); see 5 C. Wright and A. Miller, Federal Practice and Procedure § 1363 (1969).

The Court rejected the plaintiffs' claim that the intelligence activities had a "chilling effect" upon the exercise of their First Amendment rights, for they were unable to point to any resulting direct injury or immediate threat of harm. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.' United Public Workers v. Mitchell, 330 U.S. 75, 89, [67 S.Ct. 556, 91 L.Ed. 754] (1947)." Laird v. Tatum, *supra*, 408 U.S. at 13–14, 92 S.Ct. at 2325.

Appellants seek to distinguish *Tatum* but we are not persuaded that the proffered distinctions do anything more than establish that their case is considerably weaker than that of the plaintiffs in *Tatum*. Appellants here urge that in *Tatum* there was a general challenge to an existing system of military surveillance of civilian activities which created a chilling and inhibiting effect on the full expression of First Amendment rights. In the case at hand they claim that the intrusion was specific since it related to particular acts of specific Government agents. We fail to see what solace appellants find in making the distinction. The ongoing and pervasive military surveillance of civilian activity alleged in *Tatum* would seemingly create a more understandable apprehension of inhibition of First Amendment rights, than the *ad hoc* response of a civilian agency here to a major and massive demonstration in Washington, D.C. The historic revulsion of the American civilian for military intrusion in fact was a principal theme of Mr. Justice Douglas's dissent in *Tatum*.

The danger of injury to person and property here was not only obvious to the Attorney General who the District Court judicially noticed, had the responsibility for coordinating Federal Government activities relating to civil disturbances and who relied principally upon the FBI, but it was also fully comprehended by the New Mobilization Committee which was exchanging information on a regular basis with the Department of Justice. The Committee moreover was in the process of recruiting and training 500 to 600 "marshals" to

---

7. The *Tatum* plaintiffs alleged:

   The information collected by the defendants' agents is regularly, widely and indiscriminately circulated via military teletype maintained by defendants. This network provides every major Army troop command in the continental United States and military headquarters in Europe, Alaska, Hawaii and Panama with daily and weekly reports on vir-

   tually all political protest occurring anywhere within the United States.
   They further alleged:

   Defendants plan to make the information contained in the data bank, mentioned in the preceding paragraph, available to numerous federal and state agencies upon request.
   (Plaintiffs' Complaint ¶¶ 9 & 13, Laird v. Tatum, *supra*.)

maintain safety and to avoid confrontations created by "hot-headed elements within the ranks of demonstrators . . . ."

■ Beyond any reasonable doubt the FBI had a legitimate interest in and responsibility for the maintenance of public safety and order during the gigantic demonstration planned for Washington, D.C. In fact, had it been ignored the agency would be properly chargeable with neglect of duty. The suggestion that since the Committee was supplying the Department of Justice with information, total reliance should have been placed on it and law enforcement agencies should be content to sit back and only react to actual violence, is not persuasive. Cf. Anderson v. Sills, 56 N.J. 210, 265 A.2d 678, 684–685 (1970). No matter how peaceful the intent of its organizers, the assemblage of the vast throng planning to protest the Vietnamese action and to express their sincere and conscientious outrage, presented an obvious potential for violence and the reaction of the Government was entirely justifiable. That reaction was not to deter, not to crush constitutional liberties but to assure and to facilitate that expression and to minimize catastrophe which in the end would harm the cause of the plaintiffs more than the disruption or violence would injure the Nation. Hence we reject the argument that the specific intelligence operation complained of, presents a legal distinction from *Tatum* which benefits the appellants here. Our conclusion is to the contrary.

■■ In *Tatum* as we have indicated, the Court found mere speculative apprehension of future misuse of information and hence no objective harm and no justiciable issue. This case is no different. There is no showing of any misuse of information and the plaintiffs' allega-

tions on information and belief with respect to photographs, check duplication and list compilation were not established and in fact disproved. The shivering here was self-induced. See Laird v. Tatum, *supra,* 408 U.S. at 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154; Finley v. Hampton, 473 F.2d 180 (D.C. Cir. 1972); Donohoe v. Duling, 465 F.2d 196, 201–202 (4th Cir. 1972); compare Handschu v. Special Serv. Div., 349 F.Supp. 766 (S.D.N.Y.1972).[8] The specific activity of Agent Constantino by no means rose to the level of a constitutional invasion of privacy. "Thus far only the most intimate phases of personal life have been held to be thus constitutionally protected." Rosenberg v. Martin, 478 F.2d 520, 524 (2d Cir. 1973). Nor do the appellants have a right to complain about the defendant bank's voluntarily surrendering its own limited records to a government agency. See Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); Application of Cole, 342 F.2d 5 (2d Cir.), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965). Since the plaintiffs admittedly represented a broad political spectrum united only in a vigorous opposition to American troops in Vietnam, it is indeed difficult to imagine in the light of subsequent historic events, what misuse intelligence agencies might possibly make of whatever data was collected which might harm the plaintiffs.

The appellants argue further that in *Tatum* the Army intelligence network gleaned its information principally from public sources in contrast to the specific examination of bank records by Agent Constantino. Actually, the eleven volume collection here summarized in 200 pages, could not have been based on Constantino's meager contribution. The Moratorium Demonstration was not clandestine, its very success depended upon the widest possible publicity. Bus

---

8. Cases such as Hentoff v. Ichord, 318 F. Supp. 1175 (D.D.C.1970), involving threats to generally publicize the information gathered, are not germane to the present case. As plaintiffs' unsuccessful efforts to secure access to the FBI files indicate, the Bureau does not intend to make the information available for public inspection.

departure points and availability of rail and other transportation facilities were broadly publicized and anonymity was never sought by its sponsors. The concern of the FBI was with numbers and transportation and the Bank inquiry was clearly related to that concern. The financial ability to charter busses to transport thousands of demonstrators was germane if any realistic appraisal of manpower was to be made. The argument that the FBI only ascertained the initial financial support of the group and that this information was not helpful or pertinent to make this estimate only emphasizes how minor the intrusion in fact was.

The argument is raised that there was no improper use of the data collected in *Tatum* but that there was widespread dissemination of the information collected here. This is not the fact. As previously noted, the *Tatum* plaintiffs alleged widespread dissemination, and Mr. Justice Douglas stated in his dissenting opinion: "the intelligence reports were regularly and widely circulated and were exchanged with reports of the FBI, state and municipal police departments, and the CIA." Laird v. Tatum, *supra,* 408 U.S. at 26, 92 S.Ct. at 2332; see ACLU v. Laird, 463 F.2d 499, 502 (7th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 902, 34 L.Ed.2d 699 (U.S.1973).

While the argument is made that the Army destroyed its records in the *Tatum* case, there was no showing there that its distributees followed a similar course. The distribution here (see footnotes 3 and 4 *supra*) was appropriate in view of the responsibility of the various official agencies made privy to the reports. The only question raised as to the propriety of distribution is the inclusion of "Internal Revenue Service" which conjures up the spectre of tax audits and investigations. In fact there has been no claim that in the almost four years since the investigation there has been any taxpayer harassment or threat thereof. Moreover the concern of the demonstrators for the expenditure of tax revenues to support the military presence in Vietnam, justified the fear of IRS that its facilities in Washington would be a natural target of the wrath of those assembled.

In sum, although the plaintiffs here have singled out a particular and specific investigative incident, they have, as the court below found, failed to establish any specific harm, real or threatened. In our view they have failed to present a justiciable controversy and under *Tatum* we find no jurisdiction in the federal courts to entertain their action.

■■ Neither do we find any reason to hold that Judge Tyler abused his discretion in limiting plaintiffs' discovery. "It is the unusual and exceptional case where the determination of the trial court (in discovery of Government documents) is set aside." Brown v. Thompson, 430 F.2d 1214, 1216 (5th Cir. 1970); Swanner v. United States, 406 F.2d 716 (5th Cir. 1969). In a declaratory judgment action, "the complaint must stand or fall on its own merits and cannot be used as a vehicle for searching out and discovering a right of action." 5 C. Wright and A. Miller, Federal Practice and Procedure § 1238, at 204 (1969) (footnote omitted); Laird v. Tatum, *supra,* 408 U.S. at 14, 92 S.Ct. 2318.

Affirmed.

OAKES, Circuit Judge (dissenting):

I

There has been detected a tendency in recent times to justify invasion of constitutional rights on the basis of national security. *See* Sullivan v. Murphy, 478 F.2d 938 (D.C. Cir., 1973) (participants and bystanders arrested in 1972 Washington May Day demonstration entitled to order expunging or restricting use of arrest records compiled during unlawful detention). The tendency has not been wholly recent, of course. *See generally* Developments in the Law—The National Security Interest and Civil Liberties, 85 Harv.L.Rev. 1130, 1133 (1972). Big Government has commenced from time to time with the objective of protecting the public's security but in the process

has infringed upon or invaded or jeopardized the only real security of the individual, the security provided by the Bill of Rights. Listed in the Great Bill as belonging to the public is "the righ[t] to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . .," under the express terms of the fourth amendment; implied is a "guarantee of certain areas or zones of privacy" under the first, or the fourth and fifth, or the ninth amendments, or the "penumbra" of the Bill of Rights. *See* Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (U.S., Jan.22, 1973). Included also among these precious rights of the "people" which have been threatened from time to time historically by ill-advised or, occasionally perhaps, malevolent governmental officials in the purported interests of "security" are rights set forth in the first amendment, not just of "the freedom of speech" but also the "right . . . peaceably to assemble, and to petition the Government for a redress of grievances." From these rights expressly protected has been wisely and necessarily implied a right to freedom in political associations. *See, e. g.,* Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). These are the rights surrounding the basic freedom of thought, which carries with it in a democracy the right to protest the conduct of Government. That right of protest is one which has had some of its greatest challenges in the recent span of years during which this country has been involved in the most unpopular war of its history. *See* New York Times Co. v. United States, 403 U.S. 713, 717, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (opinion of Black, J.). *See also* United States v. National Committee for Impeachment, 469 F.2d 1135 (2d Cir. 1972); Cortright v. Resor, 447 F.2d 245, 255 (2d Cir. 1971) (dissenting opinion), cert. denied sub nom. Cortright v. Froehlke, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).

In the light of the above, I start with the premise—and I suspect the majority would not disagree with the premise, though the majority opinion commences at the other end of the rights-security spectrum—that a group, even a huge group, of people who want to go to the seat of government to protest a war and who do so peaceably have the right not to have their name (and hence their views against the administration or the Congress or the courts or the policies of any in relation to the war) listed in some dossier or table or catalog of protesters and disseminated throughout all the major branches of the "security system" of the United States. To this end, subsidiarily, they also have the right—or individual members of the group have the right—not to have their personal "papers and effects" unreasonably searched or examined.

More specifically, there is a constitutional guarantee absent some compelling state interest against compulsory disclosure of membership in or affiliation with a group—particularly a dissident group—that is exercising first amendment freedoms. As Mr. Justice Stewart said for the Court in Bates v. City of Little Rock, *supra,* 361 U.S. at 523, 80 S.Ct. at 416, "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." As Mr. Justice Harlan said for the Court in NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958):

It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association. . . . This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of associa-

tion, particularly where a group espouses dissident beliefs.

Bates, Patterson and Louisiana ex rel. Gremillion v. NAACP, *supra,* are the staunchest of authorities for the right of the members of the Fifth Avenue Peace Parade Committee to have remained anonymous and not to have had —for whatever purposes Big Government might wish to make further use of them—their names listed and kept in "security" agency files.

## II.

At the other end of what I have called the rights-security spectrum is the duty of law enforcement agencies in the United States to make certain that the persons of government officials and the property of Government are protected against violence in any form. *See* Anderson v. Sills, 56 N.J. 210, 265 A.2d 678, 689 (1970). In this respect I agree wholly with the majority view that "Beyond any reasonable doubt the FBI had a legitimate interest in and responsibility for the maintenance of public safety and order during the gigantic demonstration planned for Washington, D.C." I also agree completely with the Special Agent in charge, Phillip H. Wilson, that that duty included the duty "to know who was coming, how many were coming, mode of transportation, arrival, when they expected to leave Washington, any individuals that had a potential record of violence, or who might threaten the President's life, or a Cabinet member, or anything of that nature." In this respect the Bureau here was acting properly in attempting to determine the size, nature and scope of New York Moratorium activities and in attempting to obtain an estimate of the number of buses and trains that the Peace Parade Committee could hire. The Bureau was acting perfectly properly in observing the bus departures, counting the buses and the passengers leaving the city of New York, as well, of course, in making inquiry of the Allied Bus Company.

The court below found and, while there was a considerable absence of dis-

covery below, I have no reason to doubt found properly, that the FBI made no attempt (A) to photograph the departing passengers; (B) to compile a list of the departing passengers; (C) to examine any checks deposited in the account of the "Washington Transportation Fund"; or (D) to compile a list of the persons who signed checks payable to that fund.

While the case would have been different if movies had been taken of the departing protesters, or if lists of passengers or contributors had been compiled, the FBI's overall "surveillance" of the Moratorium activities in New York was perfectly proper and a legitimate exercise of governmental duty to ascertain how big the demonstration was likely to be and to observe whether there were any indications that violence might be in the offing. The fact of the surveillance, thus limited in methodology, was no infringement of rights.

## III.

Thus this case boils down to two questions. The first is whether the listing by the agent who talked to the bank of the names of the individuals listed on the signature cards for the Washington Transportation Fund was improper, particularly if it was subsequently disseminated to other governmental agencies, including the IRS. The second question is whether the subsequent dissemination by the FBI of a summary of its huge investigation to other agencies of government, including the IRS, operated as an infringement of protected rights. I answer both questions in the affirmative.

Concerning the first question, it is totally immaterial to the ascertainment of the number of protesters going to Washington to know or list the names of the people authorized to sign checks on the Washington Transportation Fund. In my view, it was perfectly proper for the FBI to inquire of the bank the amount of money in that account, since this was relevant to the number of buses that might be expected to be hired. To gather the names of the authorized signato-

ries, however, is no different from ascertaining membership (or leadership) in a "group espous[ing] dissident beliefs" struck down in *Bates, Patterson* and *Gremillion, supra*. If there were dissemination of such a list beyond the FBI, which we do not know (although we do know that the names remain in the FBI files), so much the worse. It is no answer to my mind to suggest as the majority seems to imply that the Committee wanted to publicize its program in the press and through flyers and leaflets or "to make visible" public opposition to the war; publicizing the Committee's efforts and involuntarily listing the members are two different things. *Cf.* United States v. National Committee for Impeachment, *supra*. Nor is it any answer to say that this is a very small infringement or a very little interference with constitutional guarantees. As I have said in another context, "[e]ven a very little chill on a very big right is too much." Cortright v. Resor, *supra*, 447 F.2d at 258 (dissenting opinion).

Concerning the second or dissemination question, the demonstration having ended peaceably, the protesters having gone home, the persons of government officials and the property of the Government having been secured, I can see no earthly reason why it was necessary for the FBI to disseminate its summary report to the IRS and assorted other intelligence agencies of the Government. It is said that this was done as "routine." That may be so, but then it seems to me that the "routine" should be changed by order of the court, at least to the extent that the summary report included names of peaceable individuals involved in the demonstration; name listing was unnecessary to what is supposedly a routine intelligence report from one law enforcement agency of Government to another on how a given demonstration was handled. I would except from this, of course, any names of persons who engaged in or were thought to have engaged in any violence whatsoever. I include within it, however, the names of any persons who confined their Moratorium activity to the peaceful exercise of the constitutional rights above set forth. To the extent that the summary report sets forth the names of peaceable demonstrators, I would require that they be expunged. While the war in Vietnam is over, and some might suggest that this whole case is therefore moot, bombing in Southeast Asia proceeds and it may be yet that there will be another demonstration against governmental participation. The injunction that I would require be issued would prevent the infringement of constitutional rights in such event.

IV.

On the issue of justiciability, I distinguish Laird v. Tatum, 408 U.S. 1, 92 S. Ct. 2318, 33 L.Ed.2d 154 (1972), on the basis that the majority opinion there construed the complaint narrowly as containing no allegations of any specific misuse of data gathered by the Army Intelligence network, irrespective of the statements in the dissent to *Tatum* or how another court might have construed the allegations of the complaint. I cannot believe that *Tatum* validated clandestine electronic or photographic surveillance, *see* Donohoe v. Duling, 465 F. 2d 196, 201 (4th Cir. 1972); rather I think the holding was "narrow[ly]" limited to general surveillance without specific misuse of data. *See* Handschu v. Special Services Division, 349 F.Supp. 766, 769 (S.D.N.Y.1972) (Weinfeld, J.). *See also* The Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 131 (1972). *Cf.* United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (warrantless domestic security wiretap unlawful). Moreover, in the light of recent reports of Watergate-allied events, and the Senate Report, S.Rep. No. 524, 92d Cong., 2d Sess. (1972), by Senator Ervin's Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, indicating that the *Tatum* majority seriously underestimated the size and scope of Army intelligence activities which included gathering public and private in-

formation on hundreds of thousands of "politically suspect" persons, one wonders also whether the *Tatum* case might not be qualified today. Thus I would decide the question of justiciability in the plaintiffs' favor and also would give them standing. *See* National Student Association v. Hershey, 134 U.S.App.D. C. 56, 412 F.2d 1103, 1115 (1969); 83 Harv.L.Rev. 935, 938–939 (1970). The district judge has inspected the FBI's "summary report" in camera and himself found nothing in it, with one exception, that demonstrates any underlying need for secrecy in respect to it. I would therefore order its disclosure on the basis that it does not come within the "investigatory files" exception to the Freedom of Information Act, 5 U.S.C. § 552, Frankel v. SEC, 460 F.2d 813 (2d Cir.), cert. denied, 409 U.S. 889, 93 S.Ct. 125, 34 L.Ed.2d 146 (1972), because here it is the governmental agency itself which is challenged as having engaged in unlawful conduct, and there is probable cause to believe that at least to a slight extent it did so.

I accordingly dissent.