Nathan **GARDELS** et al., Plaintiffs,

v.

Peter C. **MURPHY** et al., Defendants.

No. 73 C 2336.

United States District Court,
N. D. Illinois, E. D.

May 28, 1974.

William P. Rosenthal, Harvey J. Barnett, I. Walter Deitch, Robert R. Tepper, Chicago, Ill., for plaintiffs; Howard Eglit, American Civil Liberties Union, Chicago, Ill., of counsel.

James R. Thompson, U. S. Atty., for Chicago, Ill., for Peter Murphy.

Robert L. Graham and Alan L. Metz, William Henkel.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

### Motion to Dismiss, or in the Alternative, for Summary Judgment

This lawsuit arises from the events surrounding the visit of President Richard M. Nixon to Pekin, Illinois, on or about June 15, 1973, for the purpose of attending a non-partisan, non-political public event—the dedication of the Everett M. Dirksen library. Plaintiffs, all members of the Indochina Peace Campaign, a voluntary association of persons opposed to the war in Viet Nam and the bombing of Cambodia, joined the public-at-large in lining the streets and gathering in the main public park to see and hear the President. According to the complaint, plaintiffs and other members of the Peace Campaign were attempting peacefully to express their views in opposition to the war in Indochina and in opposition to the Nixon administration in general, primarily through dissemination of literature and through the carrying of signs and banners which reflected their views, such as signs which stated "Stop the War" and "You Can't Hide from Watergate in Pekin." Other persons favoring the policies of the administration, and seeking to express their sentiments, were also in attendance, some carrying signs and banners of their own.

Plaintiffs contend that employees and agents of the Presidential Advance Office, which is a part of the White House Office, a division of the Executive Office of the President, violated their First, Fourth, and Fifth Amendment rights. Specifically, the complaint alleges that defendant Murphy and other advancemen assaulted plaintiffs, ripped and tore signs and banners from their hands, and harassed, intimidated, disrupted, and prevented plaintiffs from expressing their views. Furthermore, sign-carrying persons in the crowd supporting the President were left undisturbed.

Plaintiff further complains that the actions of advancemen Murphy, "Richard Roe", "John Doe", and other persons yet to be identified but associated with the Executive Branch of the United States government, were part of a continuing course of premeditated, conspiratorial conduct on the part of the White House Advance Office and its Director, defendant William Henkel, to suppress rights of freedom of speech of those who disagreed with the policies of the administration at public gatherings where President Nixon spoke. It is alleged that Murphy and other advancemen behaved as they did as part of this conspiracy and with the direction, approval and knowledge of Henkel and other co-conspirators.

The complaint is brought in three counts, pursuant to 28 U.S.C. § 1331 and under the First, Fourth, and Fifth Amendments to the Constitution of the United States. Count I is brought as a class action and alleges the harassment, intimidation, threats, taking of property, humiliation and embarassment caused by defendant Murphy and the unidentified

co-conspirators, and seeks a judgment against Murphy, John Doe and Richard Roe in favor of each plaintiff in the sum of $15,000 actual damages and $15,000 punitive damages. Also, Count I alleges that plaintiffs reasonably fear that defendants Murphy, Doe, and Roe will take similar action at similar public meetings held in the future; to avoid this "chilling effect" upon the exercise of First Amendment Rights, plaintiffs seek a permanent injunction to restrain defendants from engaging in such conduct.

Count II is an action based on common law assault, and is brought by plaintiffs Nathan Gardels and Margaret Curran-Gardels against defendant Murphy in the sum of $5000 actual damages and $15,000 punitive damages. Jurisdiction is based both on the principle of pendent jurisdiction, and independently on diversity jurisdiction, inasmuch as defendant is a citizen of Oregon and plaintiffs are citizens of Illinois.

Count III is a class action which charges that Director Henkel and other unidentified co-conspirators conspired with advancemen-defendants Murphy, Roe, and Doe to perpetrate and perform the conduct complained of in Counts I and II, and that Henkel directed, instructed, authorized, and agreed with the advancemen that they should perform in this manner. Plaintiffs seeks a judgment against Henkel and the unidentified conspirators in favor of each plaintiff in the sum of $15,000 actual damages and $15,000 punitive damages, as well as an injunction to restrain defendants from engaging in similar conduct at similar meetings in the future.

Each of defendants Henkel and Murphy has filed a motion to dismiss the action against him, or in the alternative to grant summary judgment in his behalf. Though the motions were filed and briefed independently, we have consolidated them for decision, inasmuch as some aspects of the discussion are pertinent to both parties' motions.

Defendant Henkel seeks dismissal based on the doctrine of official immunity. The leading case in this area is Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), further explored in Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), on remand, 456 F.2d 1339 (2d Cir. 1972). These cases dictate that we resolve two issues: (1) taking the allegations of the complaint as true, as we must, is there a showing that defendant was acting within the outer perimeter of his line of duty; and if so, (2) was he alleged to be performing the type of "discretionary" function that entitles him to immunity from suit. We believe that Henkel is entitled to immunity.

In determining whether Henkel was acting within his line of duty, we are mindful of *Barr's* approval of the following language that "acting within line of duty" is not to be construed narrowly:

> The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him . . . . Gregoire v. Biddle, 2 Cir., 177 F.2d 579, 581. 360 U.S. at 572, 79 S.Ct. at 1340.

*Bivens* states:

> We believe that what is meant by the phrase "within the outer perimeter of [an officer's] line of duty" is that the officer must have been acting in his

role as a government officer. 456 F. 2d at 1345.

Clearly, defendant Henkel's actions at Pekin, Illinois were not manifestly or palpably beyond his authority, when interpreted in accord with the controlling cases cited above.

Plaintiffs further argue that Henkel's duties do not involve the exercise of discretion. Unfortunately, there is no litmus paper test to distinguish acts of discretion, Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655, 659 (2d Cir. 1962), but "the broader the range of responsibilities and duties, . . . the wider the scope of discretion . . . " Barr v. Matteo, 360 U.S. at 573, 79 S.Ct. at 1340. Though defendant Henkel's duties are not statutorily defined, they would appear quite broad, and include planning, coordinating and execution of Presidential trips, organizing the efforts of local sponsors, meeting with governors, mayors, and business and community leaders as the President's personal representative, working with the Office of the Military Assistant to the President and Secret Service to determine the best logistical arrangements, arranging housing and logistical support for Presidential overnight visits, and planning for potential contingencies and coordinating solution to emergencies. The duties, considered together, require a considerable degree of discretion in their execution.

■■ Defendant Henkel has cited to us many cases to support his contention that he is entitled to immunity, most of which cases involve Secret Service agents or federal law enforcement officers. We have much less confidence in applying the immunity doctrine to this situation than to those presented us as precedent, because one of the most important rationales underlying the doctrine of official immunity is to prevent threats "which might appreciably inhibit the fearless, vigorous, and effective administration of the policies of government." Such fearlessness is better found in the Secret Service than in the Advance Office. Nonetheless, a person in the position of Director of Advance Office has sufficiently large responsibilities and potential conflict with the public that he or she should be free to exercise the duties of the office unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service. Barr v. Matteo, supra, 360 U.S. at 571, 79 S. Ct. 1335.

■ Plaintiffs point out that even if the doctrine of official immunity is applied to Henkel to protect him from damage suits, he is still subject to a suit seeking injunctive relief. Defendant contends that injunctive relief is inappropriate, because the complaint alleges constitutional violations stemming from a sole non-recurring event of June 15, 1973, and an action based upon enjoining future behavior does not, in this instance, present a justiciable case or controversy within Article III of the Constitution. Again we agree with defendant.

We believe that this issue is governed by Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). In *Tatum*, the several plaintiffs, four individuals and nine unincorporated associations, sued on their own behalf and on behalf of all other individuals and organizations who wish to exercise their First Amendment rights "without fear of harassment, intimidation and injury resulting from investigation, surveillance and record keeping by military authority." (Plaintiffs' Complaint ¶ 5, Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). The complaint alleged that the intelligence agencies of the United States Armed Forces were continually engaged in the surveillance of lawful and peaceful civilian activity, that the information collected concerning the plaintiffs served no legitimate military purpose, was widely and indiscriminately disseminated and was stored in computerized data banks. It further

alleged that a "blacklist" of potential troublemakers had been compiled. The plaintiffs claimed that the defendants' activities inhibited and curtailed their free exercise of First Amendment rights and deprived them of their constitutionally guaranteed right of privacy. Since the Supreme Court was reviewing a motion to dismiss on the pleadings, the allegations of the complaint and of the supporting affidavits had to be accepted as true.

The Court rejected the plaintiffs' claim that the intelligence activities had a "chilling effect" upon the exercise of their First Amendment rights, for they were unable to point to any resulting direct injury or immediate threat of harm. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.' United Public Workers v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947)". Laird v. Tatum, *supra,* 408 U.S. at 13–14, 92 S.Ct. at 2325.

In Fifth Avenue Peace Parade Committee v. Gray, 480 F.2d 326 (2d Cir. 1973), plaintiff antiwar organization complained that an FBI investigation conducted immediately prior to the November 14–16, 1969, Moratorium Demonstration in Washington, D. C., and the dissemination of the FBI reports of this investigation to various other Government agencies, had and would continue to have a chilling effect upon the exercise of its constitutional rights and further constituted an illegal search and an invasion of privacy. The court in *Fifth Avenue* noted that plaintiff's case therein was considerably weaker than the case of plaintiffs in *Tatum,* and affirmed a lower court ruling that plaintiffs failed to present a justiciable controversy. The court explains, 480 F.2d at 331:

In *Tatum* there was a general challenge to an existing system of military surveillance of civilian activities which created a chilling and inhibiting effect on the full expression of First Amendment rights. In the case at hand they claim that the intrusion was specific since it related to particular acts of specific Government agents . . . . The ongoing and pervasive military surveillance of civilian activity alleged in *Tatum* would seemingly create a more understandable apprehension of inhibition of First Amendment rights, than the *ad hoc* response of a civilian agency here to a major and massive demonstration in Washington, D. C. The historic revulsion of the American civilian for military intrusion in fact was a principal theme of Mr. Justice Douglas's dissent in *Tatum.*

The case at bar falls on a spectrum somewhere between *Tatum* and *Fifth Avenue*; while not alleging something as pervasive and potentially ominous as a system of military surveillance of civilian activities, the complaint does allege a continuing course of conduct by conspirators to direct advancemen of the White House to suppress freedom of speech, demonstration, and assembly in the presence of the President. We note, however, it is wholly conjectural that another occasion will arise in which an agent or employee of the Advance Office will harass a demonstrator. The injunctive prayer is based on mere speculative apprehension and not on a claim of specific present objective harm or a threat of specific future harm. There is insufficient immediacy and reality to plaintiffs' allegations of future injury, Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), hence no justiciable issue, and no need to invoke the jurisdiction of this court on this aspect of the lawsuit.

■ Even if defendant Henkel is not entitled to dismissal because either (1) he is not entitled, on the facts herein, to the protection of the doctrine of official immunity, or (2) this court is presented with a justiciable case or controversy

with regard to plaintiffs' prayer for injunctive relief, defendant Henkel is entitled to summary judgment.

▬▬ Rule 56 states clearly that a summary judgment shall be rendered if the pleadings and affidavits, together with other extraneous materials, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. This court has before it for its consideration the affidavits of defendants Henkel and Murphy, the deposition of defendant Murphy as an adverse witness taken by plaintiffs, and some exhibits of travel vouchers, newspaper clippings, and memoranda from the Advance Office pertaining to the Pekin incident. Where on the basis of the materials presented by his affidavit and exhibits the movant would be entitled to a directed verdict and the opposing party fails either to offer counter-affidavits or other materials that raise a credible issue or to show that he has evidence not then available, summary judgment may be rendered for the moving party. The opposing party may not hold back evidence until trial; he must present sufficient materials to show that there is a triable issue. *See, generally,* 6 Moore, Federal Practice ¶ 56.11. In the instant case, plaintiffs have made no such showing against defendant Henkel.

Defendant Henkel testified in his affidavit that "the Secret Service Intelligence Report indicated no organized demonstrator plans for the visit" (paragraph 9), and that:

The only information I received regarding demonstrators during the public portion of the President's motorcade in downtown Pekin, when we were approximately two blocks from the Library site. I learned that a group of demonstrators were located across the street from the docking site for the Presidential motorcade and that some rocks had been thrown and that the demonstrators might have some tomatoes. I did nothing further on the matter. At no other time during the event did I concern myself with demonstrators. (Paragraph 13 of affidavit).

When defendant Murphy was asked at his deposition whether he had had any direct communication with Mr. Henkel, either verbally or in writing, he replied:

"It was—we were so busy that I just 'hi, Pete,' and 'hi, Bill', you know at a distance. He's very close to the President and I am not, and I was working and that was it. I mean there was no —didn't even shake his hand, as a matter of fact.

Question: And you didn't receive any verbal instructions from him at that time?

Answer: (nodded head in the negative). No. (Murphy's deposition p. 55)."

Later in the deposition, Mr. Murphy was questioned about conversations he had with Henkel following the Pekin incident.

"Question: You mentioned a conversation that you had with Mr. Henkel after the Pekin incident. Was there only one conversation, that you had with him?

Answer: No, there were a couple when it all broke.

Question: Then you met with him for lunch once after the Pekin incident?

Answer: Well, the telephone conversations were in July and I had lunch with him in October.

Question: And essentially those conversations consisted of a review of the event in Pekin, then, and Mr. Henkel expressing to you what his views were on the subject?

Answer: Right. I mean identification, first of all. I mean they evidently had a photo that I have never seen, and he said that 'they contend that you are the man that supposedly tore down a sign. Did you or did you not?' And I said, 'Yes, I did tear down a sign there, Bill.'

Question: Then what did he say?

Answer: Well, he was very upset about it. He said, 'You know, nobody ever gave you any authority to move with the public in that kind of way, shape or form' I said, 'No, I'm sure you didn't, but it happened,' you know.

\* \* \* \* \* \*

Answer: No, it was—it was very voluntarily. He said that—he said, you know, 'If you did', he said, 'I wish you would apologize.' I mean 'It's embarrassing to us, the White House,' and Senator Stevenson and Percy were demanding an investigation. And I said, 'Fine.' I said, 'I will apologize.' I said, 'God,' I mean, 'there was no intention to have this ever happen.' I mean to this degree, and that led to the second call.

Question: Which was what?

Answer: Well, it was that day or the next day about the apology.

Question: He set that up?

Answer: Well, he said, you know, 'The pressure is on us and they want to get out of it. Is it all right if we release it?' And I said, 'Sure. My identification. I don't give a damn. I am a businessman in Eugene, Oregon. That's fine, Bill. I don't want the President or anybody, you or anybody else, to be embarrassed about it because one of your volunteer advance people did this.' And I said, 'Fine. Let it hang out,' you know. So they released it. They gave my identity, and I saw the release, and I am sure you did, too. Said it was a volunteer advance man and it was released that way. Oh, they were upset about it." (Murphy's deposition p. 63–65).

On July 17, 1973, two days following the Pekin incident, Henkel released a memorandum to his advancemen, the subject heading of which is entitled "Policy Reaffirmation Regarding Demonstrators" and which states in part:

It is not [the Advance Man's] function to control any expression of free speech or to in any way inhibit the activities of a demonstrator, regardless of the manner in which he presents his views. Nor is [the Advance Man's] role that of a law-enforcement officer. Should [an Advance Man] see anyone demonstrating in a manner which [the Advance Man] feel[s] interferes with the rights of others in attendance, it should be brought to the attention of a duly constituted law-enforcement officer, specifically an agent of the Secret Service, for his evaluation and judgment. It is the Secret Service agent's responsibility to pursue the matter with the local law-enforcement representatives.

I know that advancing a Presidential event is an exacting, hectic experience, and advance work is extremely demanding. However, this will not be accepted as an excuse for inappropriate or illegal acts. These cannot and will not be tolerated.

Having considered the affidavits, deposition, pleadings and exhibits before us, we find that defendant Henkel has satisfied the summary judgment standard set forth herein, and that plaintiffs have failed to create a triable issue of facts. Henkel's motion for summary judgment is granted.

We now consider defendant Murphy's motion to dismiss or for summary judgment. Assuming for purposes of the motion to dismiss that Murphy is a federal agent or employee, or acting under color of federal authority, this court must resolve whether he, too, is entitled to the protection of the doctrine of official immunity. We note, first, that "it is not the title of the office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to 'matters committed by law to his control or supervision,' . . . . which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity . . . ." Barr v. Matteo, *supra*, 360 U.S. at 573–574, 79 S.Ct. at 1340. However, the broader the range of responsibilities and duties, . . . the wider

the scope of discretion. *Id.* at 573, 79 S.Ct. 1335. We conclude that there is nothing about Murphy's duties or responsibilities which justifies cloaking him with official immunity.

By Murphy's own admission at deposition, his tasks were "belittling" and "just detail work", and involved lining up limousines, seeing that persons in the motorcade got to the proper car, taping signs on buses and windows, and roping off areas. Policy decisions were made by those with greater authority; no discretion was needed in his job. Therefore, as *Bivens* concludes, "The real question to be asked is whether or not [the performance of such] duties warrant the protection of the immunity defense." 456 F.2d at 1346. We hold, in this case, it does not.

■ Murphy further argues that plaintiffs have failed to state a cause of action, inasmuch as Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), when properly limited to its facts, pertains only to suits alleging violations of the Fourth Amendment. We reject that contention. While there are a smattering of cases which restrict *Bivens* in this manner, the overwhelming number of authorities, and in this court's opinion the better-reasoned ones, refuse to read *Bivens* so narrowly. Justice Harlan's compelling logic in his concurrence clearly does not depend for its validity upon the fact that the Fourth Amendment, as opposed to the First or the Fifth Amendments for example, was involved. United States ex rel. Moore v. Koelzer, 457 F.2d 892 (3rd Cir. 1972); Bethea v. Reid, 445 F.2d 1163 (3rd Cir. 1971); Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938, 965 n. 2 (1973); Marsh v. Kitchen, 480 F.2d 1270, 1271 n. 2 (2d Cir. 1973); Butler v. United States, 365 F.Supp. 1035 (D.Hawaii 1973). *Bivens* recognizes a cause of action for damages for violation of any constitutionally protected interest.

■ Murphy also seeks dismissal of this action on the grounds that plaintiffs have failed to complain of an action wherein the amount in controversy exceeds $10,000, as required under 28 U.S.C. § 1331. Even discounting the jurisdictional sum attached to the injunctive portion of this suit, since, as we have noted with regard to defendent Henkel, the justiciability of that aspect of the lawsuit is doubtful, we still find that plaintiffs have alleged the requisite jurisdictional amount. It is not incumbent upon plaintiffs to show to an absolute certainty that each plaintiff will obtain a verdict in excess of $10,000. Rather, before a suit will be dismissed for lack of jurisdiction, it must appear to a legal certainty that plaintiff will not recover that amount. Jeffries v. Silvercup Bakers, Inc., 434 F.2d 310 (7th Cir. 1970). Furthermore, the action at bar is, at its core, an action sounding in tort and one for which punitive damages are recoverable; where both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining jurisdictional amount. Bell v. Preferred Life Assurance Society, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943). That plaintiffs believe Murphy acted with intent and malice is clear from the complaint, and allegations of such behavior by an advanceman in service of the President is not to be lightly dismissed for lack of jurisdictional amount without a stronger showing than that made herein.

■ Finally, Murphy seeks summary judgment, arguing that his affidavit conclusively reveals that he is a private businessman from Eugene, Oregon, engaged in the lumber business, and not a federal official who can be held liable in a federal district court under a *Bivens*-type cause of action. Murphy argues that he was merely an agent of the Republican Party, that he never received any compensation from the government, that his expenses were paid by the Republican Party and by the Committee to Re-Elect the President, and that he was merely continuing in the role of spare-time voluntary advanceman, which role he initially undertook to help assure the

re-election of President Nixon. Even assuming such to be true, this court is uncertain, in light of other facts before us, that defendant Murphy's actions were so "private" as to create insufficient "federal color" for purposes of shouldering liability under *Bivens*; at a minimum, there is a genuine issue of fact precluding summary judgment.

We note, first, that President Nixon's trip to Pekin, Illinois, in June, 1973, occurred approximately six months into his second term of office, and so was clearly unrelated to any partisan election campaign; such a fact might have a bearing in determining whether Murphy was acting in a governmental capacity —volunteer or otherwise—or "merely" as an agent of the Republican Party. We do not have before us the question of Murphy's actions as an advanceman on a clearly partisan campaign trip.

It is not persuasive for defendant Murphy to argue his agency with the Republican Party as precluding his acting under color of federal authority; ·if the Republican Party were acting as an agent for the Executive Branch in aiding with the advance work for this trip, defendant Murphy would be a sub-agent to the Advance Office of the White House. Specifically, this court sees no reason why the Advance Office could not delegate part of its authority and duty to aid in the logistics and preparation of a Presidential trip to a political party, which party and its agents would then be acting under color of federal authority.

An analogous concept is utilized in determining whether actions by political parties is "state action" for purposes of stating a cause of action under the Civil Rights Act, 42 U.S.C. § 1983, and invoking jurisdiction under 28 U.S.C. § 1343. In Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), the Supreme Court examined the legality of "white primaries", inasmuch as the Democratic Party in Texas limited its membership to white citizens and excluded blacks from voting in its primary elections. The Court said:

The [political] party takes its character as a state agency from the duties imposed upon it by state statutes; *the duties do not become matters of private law because they are performed by a political party.* (Emphasis added). 321 U.S. at 663, 64 S.Ct. at 765.

While it is clear that political parties become agents of the state in elections as a matter of statutory scheme, it also seems clear that a political party could establish a common law agency with the government whenever the government delegates authority to it. This would be. true, of course, on both a national and state-wide scale.

Further, Murphy's deposition indicates that his responsibilities as a volunteer advanceman were so closely intertwined to those of the officially government-compensated members of the Advance Office of the White House, that we would be remiss and overly-narrow in our perception of the facts to conclude that Murphy was not acting as an agent for, and on behalf of,. the White House and the U.S. government. Defendant was asked by the Advance Office in the Executive Office Building to go to Pekin. (Murphy deposition p. 49). He had a superior in the Advance Office named Gartland who gave him his assignment in Pekin (Murphy dep., p. 50). His duties were to help coordinate the President's visit, and particularly, to help at the airport and at the library dedication area (Murphy deposition p. 51, 61). He was given instructions that were used in coordinating the trip, and he attended a countdown advance meeting with the Secret Service at which instructions were given to him by the Secret Service and the Mayor of Pekin (Murphy deposition p. 60). Additionally, he was given a clearance pin to wear on his suit to show he had security clearance and to permit him in areas where the general public was not permitted. There are clearly sufficient indicia, then, for one to conclude that Murphy was acting with the mantle of federal authority draped about him, and to preclude summary judgment·on his behalf.

Having made these rulings, we look now to the propriety of designating this action as one to proceed by class, and find we must deny plaintiffs' request to so proceed. In light of our ruling as to the non-justiciability of the equitable aspects of the complaint, the allegations which remain are grievances by relatively few people seeking damages for harassment, threat, intimidation, and attempted suppression of free speech. Also, the factual questions to be resolved in determining the existence of threats and intimidation will vary from plaintiff to plaintiff. Since two of the prerequisites to establishing a class action—impracticable joinder of all members, and common questions of law or fact—are absent, we need proceed no further in our analysis of Rule 23 to determine that class action is inappropriate.

Finally, we address briefly Murphy's contention that, in the event we either dismiss Murphy or grant summary judgment for him with regard to alleged constitutional violations, we should properly abstain from consideration of the Count II assault charge. Because we have concluded that Murphy is entitled neither to dismissal nor to summary judgment, we need not rule on abstention. We note paranthetically, for the sake of completeness, that this is not a proper situation for abstention. The subject matter is not so uniquely state-related as to threaten state sovereignty by federal adjudication, nor is there a skein of state law whose unentanglement by the clear authority of a state court is required.

In sum, then, we dismiss defendant Henkel because he is immune from a damage suit under the doctrine of official immunity, and because plaintiffs' prayer for equitable relief against defendant Henkel does not present a justiciable case or controversy. Alternatively, we find that plaintiffs have failed to raise an issue of triable fact as to defendant Henkel, and that he is entitled to summary judgment.

We further find that defendant Murphy is entitled neither to dismissal nor to summary judgment, and he is ordered to further plead or move in accordance with the rules of procedure.